**UNITED STATES of America**

v.

**Jeffrey K. RAFSKY, Appellant.**

**No. 86–1243.**

United States Court of Appeals, Third Circuit.

Argued Sept. 16, 1986.

Decided Oct. 14, 1986.

Thomas A. Bergstrom, Robert N. de Luca (argued), Alexandra D. Sandler, James T. Smith, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for appellant.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Ronald H. Levine (argued), Jeffery W. Whitt (argued), Asst. U.S. Attys., for appellee.

Before ADAMS, STAPLETON and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In February 1986, Jeffrey Rafsky was convicted by a jury of 25 counts of wire fraud in connection with a check kiting scheme. He was sentenced to three years' probation and community service, and ordered to pay a $1,000 fine; in addition, he was directed to complete restitution to the bank that was defrauded by the end of the probationary period. Rafsky now appeals, claiming that a scheme to defraud based on passing checks backed by insufficient funds cannot, as a matter of law, form the basis of a wire fraud conviction.

### I.

As president and 30% owner of Trend Group, a holding company that maintained a checking account at Citizens Fidelity Bank and Trust Company in Louisville, Kentucky, Rafsky engaged in an elaborate check kiting scheme during late 1983 and early 1984. Trend Group was the sole owner of Lease Trend Company, an automobile leasing company, which maintained a checking account at the Provident National Bank in Philadelphia.

In September, 1983, the Trend Group began to experience financial difficulties, largely because of the failure of an Arab sheik to pay a substantial debt to Lease Trend. As a result, Lease Trend's payments on a $4,000,000 line of credit at Provident were delinquent. To meet the financial pressures faced by Trend Group and Lease Trend, Rafsky devised a scheme to take advantage of the "float" between the checking accounts in Philadelphia and Louisville.

Lease Trend had an agreement with Provident that gave Lease Trend immediate credit for deposits made to the Lease Trend account, at Provident, before the deposited check had actually cleared the Federal Reserve System. Taking advantage of this arrangement to create an artificially high balance in the Lease Trend account, Rafsky would write checks drawn on Trend Group's Louisville bank and deposit them in the Philadelphia bank, which would then immediately credit Lease Trend's account. The Louisville checks, however, were not backed by sufficient funds. In order to cover the amount drawn on the Louisville account, Rafsky would then transfer money by wire from Philadelphia to Louisville, drawing on the artificially high Philadelphia balance.

In February 1984, Provident investigators noticed that Lease Trend's average daily balance was unusually high, and that this high balance was due to checks drawn on the Louisville account. Following the investigation, Provident suspended Lease Trend's wire transfer privileges. The Louisville checks were then processed without the benefit of a wire transfer to cover the checks, and were returned to Provident for lack of sufficient funds. As a result, it was revealed that Lease Trend was overdrawn by some $2,815,000.

In August 1985, Rafsky and William Klein, Vice President of Finance of Trend Group, were indicted in the Eastern District of Pennsylvania on 32 counts of wire fraud in connection with this scheme. The district court granted Klein's severance motion on January 10, 1986. After the

district court entered a judgment of acquittal on counts 1 through 7 of the indictment, the jury convicted Rafsky of 25 counts of wire fraud. By the time of trial, Rafsky had reduced his debt to the Provident Bank to approximately $1,000,000.

## II.

Both at trial and on appeal, Rafsky has contended that a check kiting scheme cannot be a federal crime under the mail fraud statute, which prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... that involves use of wire, television or radio communications." 18 U.S.C. § 1343. In support of his contention, Rafsky relies on the 1982 Supreme Court case of *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), and *Williams's* progeny in this Circuit, *United States v. Frankel*, 721 F.2d 917 (3d Cir. 1983). We believe that this argument is untenable.

In *Williams v. United States*, the Supreme Court held that a check is not a "representation" or "factual statement" for purposes of 18 U.S.C. § 1014, which prohibits "any false statement or report" knowingly designed to influence a federally insured bank in making loans or other financial commitments. In his opinion for the Court, Justice Blackmun stressed that if merely passing a single bad check could form the basis of a federal prosecution, then "a surprisingly broad range of unremarkable conduct [would be] a violation of federal law." 458 U.S. at 286, 102 S.Ct. at 3092. Congress did not intend to include

such a "broad range" of minor infractions within the sweep of a federal criminal statute. "Absent support in the legislative history for the proposition that § 1014 was 'designed to have general application' to the passing of worthless checks, ... we are not prepared to hold petitioner's conduct proscribed by that statute." *Id.* at 287, 102 S.Ct. at 3093 (citation omitted).

The Supreme Court was careful, however, to distinguish between a single check backed by insufficient funds and a scheme to defraud involving passage of a series of bad checks. In reversing a conviction based on a single bad check, the Court stated:

> Under the Court of Appeals' approach, the violation of § 1014 is not the *scheme* to pass a number of bad checks; it is the presentation of one false statement— that is, one check that at the moment of deposit is not supported by sufficient funds—to a federally insured bank.

458 U.S. at 286–87, 102 S.Ct. at 3092–93. *Williams* thus draws a qualitative distinction between an individual bad check and a "scheme to pass a number of bad checks," *id.*, implying that a deliberate plan to deceive through submitting checks backed by insufficient funds is not the same sort of crime as merely passing a single bad check.[1]

Applying the rationale of *Williams*, this Court in *United States v. Frankel*, 721 F.2d 917 (3d Cir.1983), upheld a district court's dismissal of an indictment for mail fraud based on the implied representation made in passing a check written against insufficient funds. Although the mail

---

1. Congress recently enacted a federal bank fraud statute that supplements § 1014, which merely prohibits "misrepresentations or false statements." The new provision, Section 1344, specifically provides for prosecution of a "scheme to defraud" as well as for misrepresentations and false statements:

   (a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—
   (1) to defraud a federally chartered or insured financial institution; or
   (2) to obtain any of the moneys, funds, credits, assets, securities or other prop-

erty owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

18 U.S.C. § 1344.

Thus a check-kiting scheme such as the one involved here may well be punishable under § 1344, as well as under the mail and wire fraud statutes.

fraud statute was not involved in *Williams*, the Court held that "[t]he Supreme Court's holding—that the presentation of a check is not a representation or statement of any kind—is fatal to the government's theory here." 721 F.2d at 919. Further, the Court emphasized that "the same principles apply to the wire fraud violation." *Id.* at 921. *See also United States v. Tarnopol*, 561 F.2d 466, 475 (3d Cir.1977) (mail and wire fraud statutes are construed identically, and cases applying mail fraud statute are also applicable to wire fraud prosecutions). Thus the analysis in *Frankel* also applies to this wire fraud conviction for check kiting.

The indictment in *Frankel* however, was dismissed not because all check kiting schemes are immune from federal prosecution, but because the indictment there rested on a charge of misrepresentation, rather than on a scheme to defraud involving check kiting. The mail and wire fraud statutes prohibit schemes and artifices both to defraud and "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. In his opinion for this Court, Judge Weis emphasized that the mail fraud statute must be read in the disjunctive. In other words, a "scheme to defraud" need not be executed by "means of misrepresentations," although it certainly does not exclude misrepresentations. This disjunctive analysis of the clauses of the mail and wire fraud statutes has been applied in subsequent decisions of this Court, and is favored by other circuits as well. *See, e.g., United States v. Clapps*, 732 F.2d 1148, 1152 (3d Cir.1984); *United States v. Margiotta*, 688 F.2d 108, 121 (2d

Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir.1981).

Clearly, then, a scheme to defraud based on a check kiting scheme is distinguishable from a misrepresentation involving a single check drawn on insufficient funds. In *Frankel*, as in *Williams*, the government argued that merely passing bad checks is a misrepresentation within the meaning of the statute; in both cases this argument was rejected as beyond the scope of the statutes in question. But a careful reading of both *Williams* and *Frankel* reveals that a scheme to defraud that involves a check kiting arrangement was never held to be outside the prohibitions of the statutes. In fact, both cases distinguish between schemes based on passing bad checks, and the misrepresentation charged by the government here.

The ineluctable implication of *Williams* and *Frankel* is that a check kiting scheme is in fact punishable under the mail and wire fraud statutes. This conclusion is clearly in line with the decisions in other circuits.[2] In *United States v. Freitag*, 768 F.2d 240 (8th Cir.1985), for example, the Eighth Circuit gave short shrift to an argument similar to Rafsky's here. Upholding a mail fraud conviction for check kiting, the court stated:

[T]he defendant argues that our holding today will mean that all arguably fraudulent activity conducted with checks will fall within the ambit of § 1341. We reiterate that in order to obtain a conviction under § 1341, the government must prove beyond a reasonable doubt that the defendant intentionally devised a fraudu-

---

**2.** In *United States v. Carlisle*, 693 F.2d 322 (4th Cir.1982), the Fourth Circuit, reversing a conviction under § 1014, held that *Williams* precludes prosecution of "check-kiting" under that statute. The defendant in *Carlisle* had deposited two bad checks, and had attempted to obtain a loan to cover the checks. Labelling this conduct a check-kiting scheme, the court concluded that such conduct was not prohibited by § 1014. While we are in some doubt as to whether *Williams* did indeed hold that check kiting rather than the mere deposit of an individual bad check is not punishable under § 1014,

we need only note here that § 1014 prohibits only fraudulent misrepresentations. Since § 1014 does not also contain a clause that proscribes "schemes to defraud," as do the mail and wire fraud statutes, *Carlisle* is not on point for this case. As this Court held in *Frankel*, 721 F.2d at 919, *Williams* clearly applies to the misrepresentation clause of the mail and wire fraud statutes, but does not preclude prosecution under the "scheme to defraud" clause. Indeed, as noted above, the *Williams* Court itself clearly distinguished between schemes and misrepresentations. 458 U.S. at 286–87, 102 S.Ct. at 3092–93.

109

lent scheme and caused the use of the mails for the purpose of carrying out the scheme. We trust that these requirements will serve as a restraint on whatever tendency the government might have to prosecute anyone who ever bounced a check. On the other hand, where personalized checks are ordered, and monthly bank statements relied on to carry out an elaborate and systematic check-kiting scheme, the mails are being misused for criminal purposes.

768 F.2d at 244–45. *See also United States v. Pick,* 724 F.2d 297 (2d Cir.1983) (sustaining mail fraud conviction for check kiting scheme).

Indeed, check kiting schemes are, in the words of the *Freitag* court "precisely the wrong which § 1341 addresses, and federal prosecution for such activities is warranted." *United States v. Freitag,* 768 F.2d at 245. Rafsky's conduct falls within the wire fraud statute, and thus was properly the basis for a federal conviction.

### III.

For the foregoing reasons, the judgment of the district court will be affirmed.