UNITED STATES of America, Plaintiff–Appellee,

v.

Bruce BONNETT, Defendant–Appellant.

No. 88–1723.

United States Court of Appeals, Tenth Circuit.

June 7, 1989.

Kenneth P. Snoke, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty., Ron Wallace, and Susan W. Pennington, Asst. U.S. Attys., with him on the briefs), Tulsa, Okl., for plaintiff-appellee.

Stephen Jones of Jones, Bryant & Nigh, Enid, Okl., for defendant-appellant.

Before SEYMOUR, BARRETT and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Bruce Bonnett appeals his conviction of one count of conspiracy to violate 18 U.S.C. § 1344 (Supp. II 1984) in violation of 18 U.S.C. § 371 (1982), and fifty-six counts of bank fraud in violation of 18 U.S.C. § 1344 (Supp. II 1984). We AFFIRM.

### Facts

The First National Bank of Sapulpa, Oklahoma, (Bank) was chartered and opened in 1982. In May 1984, Mr. Bonnett purchased approximately five percent of the capital stock of Bank and began purchasing certificates of deposit eventually totalling $750,000. When Mr. Bonnett first purchased certificates of deposit he came into Bank with a briefcase containing approximately $160,000 in cash and purchased sixteen certificates of deposit, each for just under $10,000.

Between September 1984 and January 1985, co-defendant Lester Dierksen opened checking accounts in eleven different banks located in three states. Mr. Dierksen usually opened new accounts immediately following the closure of the existing account by the bank which had the old account. He opened each of these accounts with an initial deposit and, with one exception, made no subsequent deposits. The initial deposit of all eleven accounts totaled just under $9,000. The first of these accounts was opened in Vernon, Texas, with a deposit of $4,000; $2,500 thereof was furnished by Mr. Bonnett. The same day this account was opened, Mr. Dierksen gave Mr. Bonnett a check drawn on this account in the amount of $102,500, which Mr. Bonnett deposited in his account in Sapulpa on September 22. Between September 17 and October 23, Mr. Dierksen gave to Mr. Bonnett checks for $770,200 drawn on this account, all of which Mr. Bonnett deposited in his account in Sapulpa. The bank in Vernon, Texas returned these checks for lack of sufficient funds in Mr. Dierksen's account and then closed Mr. Dierksen's account. Subsequently, Mr. Dierksen opened ten more accounts in as many banks, with a nominal initial cash deposit usually ranging from $150 to $400.

Simultaneously with the opening of these accounts, Mr. Dierksen wrote checks drawn upon each of these accounts to Mr. Bonnett for five and six figures, which Mr. Bonnett deposited in his account in Sapulpa.

Co-defendant Carroll G. Bernard was the Chairman of the Board and Chief Executive Officer of Bank, and co-defendant Katherine Joanne Voigt, who was Mr. Bernard's sister-in-law, was the Cashier. When Mr. Bonnett deposited the Dierksen checks into his account with Bank, through the actions of Mr. Bernard, Bank gave him immediate credit for the uncollected funds. Mr. Bonnett immediately wrote checks on his account, and Bank honored them upon presentment. When various banks returned the Dierksen checks for insufficient funds, Mr. Bernard and Ms. Voigt sent the checks back for collection a second time. The payor bank would refuse to accept the check for collection a third time. On occasion, Ms. Voigt held Mr. Bonnett's checks in her drawer for a few days until his account balance was sufficiently high to allow the checks to be processed. When a Dierksen check was finally acknowledged by Bank as being insufficient, Mr. Bernard or Ms. Voigt telephoned Mr. Bonnett who promptly replaced the dishonored Dierksen check with yet another Dierksen check. The result was that Mr. Bonnett's account balances were continually shown on the books of Bank with an artificially high balance. This, in turn, allowed Mr. Bonnett the interest-free use of the depositors' monies and allowed both Bank and Mr. Bonnett to exceed Bank's lending limit. The Dierksen checks subsequently totaled in excess of three million dollars. These transactions formed the bases for counts 2 through 47.

The remaining ten counts charged Mr. Bonnett and Mr. Bernard with participating in acts to enable various persons to obtain loans from Bank, when in fact all loan proceeds went directly to Mr. Bonnett, thus circumventing the lending limits of Bank and of Bank's board of directors that Mr. Bonnett was to obtain no loans without the prior approval of the directors. The acts giving rise to these charges were contained in counts 48 through 57.

## I.

Mr. Bonnett first contends that in light of *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), counts 2 through 47, the counts based on the Dierksen checks, cannot stand. Mr. Bonnett asserts that the indictment and proof charged the defendant with bank fraud by presenting a series of insufficient funds checks and obtaining credit thereon based upon the implied representation that the checks were backed by sufficient funds. We disagree with Mr. Bonnett's interpretation of the government's theory and hold that neither the indictment nor the proof was based upon an implied representation that Mr. Dierksen had adequate funds to pay the checks, but rather was based upon the defendants' deceptive practices in their use of the worthless checks. Consequently, *Williams* does not apply to defeat the convictions herein.

The statute which forms the basis of counts 2 through 47, 18 U.S.C. § 1344, reads in pertinent part as follows:

(a) Whoever knowingly executes ... a scheme or artifice—

(1) to defraud a federally ... insured financial institution; *or*

(2) to obtain any of the moneys, funds, credits, ... or other property ... of a federally ... insured financial institution by means of false or fraudulent pretenses, representations, or promises shall be....

(Emphasis added.)

The plain language of 18 U.S.C. § 1344 sets forth two distinct crimes concerning federally insured financial institutions. Each crime requires a defendant first to knowingly execute a scheme or artifice. To convict a defendant of a crime under subsection (1), the government would have to prove the scheme *defrauded* the financial institution. To convict a defendant under subsection (2), the government would have to prove the scheme enabled the defendant to obtain certain property "*by means of false or fraudulent pretenses,*

*representations or promises,"* (emphasis added).

The superseding indictment charged Mr. Bonnett with violating both subsections of the statute; defrauding Bank *and* obtaining property by making of false pretenses, representations, or promises. The trial court, however, instructed the jury that to convict Mr. Bonnett, they had to find a scheme to defraud *or* to obtain property from Bank by means of false or fraudulent pretenses, representations, or promises. The jury returned its verdict finding Mr. Bonnett guilty on all counts. Because the jury could have convicted under either prong of the statute, we must examine the legal applicability of both to the facts presented here.

### A. The Scheme to Defraud

■ We must first address whether passing a series of worthless checks can constitute a scheme to defraud in violation of 18 U.S.C. § 1344(a)(1). We review this issue under the non-deferential de novo standard of review, *United States v. Ortiz,* 804 F.2d 1161, 1164 (10th Cir.1986), and hold that it does.

We begin our analysis by examining *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). In *Williams,* a bank president engaged in a series of transactions seemingly amounting to "check kiting" between his accounts in federally insured banks, first drawing a check far in excess of his account balance in one bank and depositing it in his account in the other, and then reversing the process between his accounts. He was charged with two counts of 18 U.S.C. § 1014 (1982), for "knowingly mak[ing] any false statement or report, or willfully overvalu[ing] any ... security, for the purpose of influencing in any way the action of" a federally insured bank. *Williams,* 458 U.S. at 282, 102 S.Ct. at 3090. In reversing the appellate court, the Supreme Court held that the deposit of a check backed by insufficient funds did not constitute the making of a false statement. "[T]echnically speaking, a check is not a factual statement at all, and therefore cannot be characterized

as 'true' or 'false.'" *Id.* at 284, 102 S.Ct. at 3091.

In so holding, the court stated that it believed Congress did not intend to make "a surprisingly broad range of unremarkable conduct" a violation of federal law. *Id.* at 286, 102 S.Ct. at 3092. The Supreme Court analyzed the legislative history of the statute and concluded that it was designed primarily to apply to borrowers. Most importantly, the Court distinguished a single insufficient funds check from a scheme involving the passing of a series of bad checks:

> Under the Court of Appeals' approach, the violation of § 1014 is not the *scheme* to pass a number of bad checks; it is the presentation of one false statement— that is, one check ... at the moment of deposit....

*Id.* at 286, 102 S.Ct. at 3092–93. In our view, *Williams* does not apply to the instant case, wherein the conduct involved a massive scheme to defraud.

Our conclusion is supported by the legislative history of 18 U.S.C. § 1344. Congress passed this general bank fraud provision in response to *Williams* and other Supreme Court decisions narrowing the applicability of then-existing bank fraud statutes. The Senate report thus states:

> Recent Supreme Court decisions have underscored the fact that serious gaps now exist in Federal jurisdiction over frauds against banks and other credit institutions which are organized or operated under Federal law or whose deposits are federally insured.

S.Rep. No. 98–225, 98th Cong, 2d Sess. 377, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3517. In response to this gap, Congress modeled the bank fraud statute "on the present wire and mail fraud statutes which have been construed by the courts to reach a wide range of fraudulent activity." *Id.* at 378, 1984 U.S.Code Cong. & Admin.News at 3519.

The mail and wire fraud statutes make the same distinction as § 1344 between schemes to defraud and schemes to obtain property by false or fraudulent pretenses, representations, and promises. *See* 18

U.S.C. §§ 1341, 1343. Courts have agreed that a check kiting scheme constitutes a scheme to defraud under the first clause of the statutes, if the mails or interstate wires are employed. *See e.g. United States v. Rafsky*, 803 F.2d 105 (3d Cir.1986), *cert. denied*, 480 U.S. 931, 107 S.Ct. 1568, 94 L.Ed.2d 760 (1987); *United States v. Pick*, 724 F.2d 297 (2d Cir.1983); *United States v. Cooper*, 596 F.2d 327 (8th Cir.1979).

*Rafsky* is particularly instructive. There the Third Circuit held that *Williams* does not preclude prosecution for passing a series of insufficient funds checks under the "scheme to defraud" clause of 18 U.S.C. § 1343 (1982), the wire fraud statute. In *Rafsky*, the defendant had engaged in a check kiting scheme between two banks located in two cities, taking advantage of the arrangement to create an artificially high balance in his bank account. He was charged with a violation of 18 U.S.C. § 1343, which prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... by means of wire, radio, or television communication...." Relying on *Williams*, Rafsky argued that a check kiting scheme cannot be a crime under the wire fraud statute. In affirming the judgment on multiple convictions, the court reiterated the distinction made in *Williams* between passing a single bad check and engaging in a scheme to defraud based on the passing of a number of checks backed by insufficient funds:

> *Williams* thus draws a qualitative distinction between an individual bad check and a 'scheme to pass a number of bad checks,' ... implying that a deliberate plan to deceive through submitting checks backed by insufficient funds is not the same sort of crime as merely passing a single bad check.

*Id.* at 107. We agree with the Third Circuit's reading of *Williams*.

In *United States v. Frankel*, 721 F.2d 917 (3d Cir.1983), the defendant was charged with violating 18 U.S.C. § 1341 (1982) (mail fraud), which reads: "Whoever, having devised ... any scheme ... to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." The circuit court upheld a district court's dismissal of an indictment for mail fraud based on the implied representation made in passing a check written against insufficient funds, but clearly limited the holding. The Third Circuit court held that *Williams* applies to the "misrepresentation" clause but does not preclude prosecution under the "scheme to defraud" clause. *Frankel*, 721 F.2d at 919. We again note the similarity in the language of 18 U.S.C. § 1341 and 18 U.S.C. § 1344, and believe this analysis applies herein.

In the instant case, the facts present a scheme to defraud Bank for the purposes of obtaining illegal loans (those which exceeded Bank's lending limits) and prohibited loans (Bank's directors had prohibited further loans to Mr. Bonnett without their approval). The Dierksen checks deposited by Mr. Bonnett were at all times treated by all defendants as if they were backed by sufficient funds even though the defendants knew, or certainly should have known, the Dierksen checks were worthless and were not backed by sufficient funds. In our view, the use of a series of worthless checks, coupled with the deceptive activities of continuing to accept identical replacement checks and the continued granting of immediate credit for uncollected funds, can and do, under the facts of this case, constitute a scheme to defraud under 18 U.S.C. § 1344(a)(1). Under the facts of this case, the continuing use and manner of treatment of the series of worthless checks constitutes a scheme to defraud.

We hold that neither *Williams* nor its progeny preclude prosecution based upon a series of insufficient funds or worthless checks under 18 U.S.C. § 1344(a)(1), the "scheme to defraud" portion of the Bank Fraud Statute. *Williams* clearly distinguishes between the use of a series of worthless checks to prove "schemes to defraud" and the use of one or more worthless checks as "false statements." This

distinction underlies our disposition of this issue.

## B. The False Pretenses, Representations, or Promises

The more difficult issue is whether the use of a series of insufficient funds checks to artificially inflate an account balance can constitute a violation of 18 U.S.C. § 1344(a)(2), which requires a scheme to obtain property "by means of false or fraudulent pretenses, representations, or promises."

We must begin our analysis by revisiting *Williams.* In *Williams,* one of the elements of the alleged violation was the making of a "false statement." As we noted above, *Williams* holds that a check is not a statement; that it is merely an order to the drawee bank to pay the face amount to the payee and a promise to pay upon notice of dishonor. *Williams,* 458 U.S. at 285, 102 S.Ct. at 3092. In *Frankel,* the Third Circuit applied *Williams,* and concluded that an indictment charging mail fraud, 18 U.S.C. § 1341, was faulty because it relied upon an implied representation in the presentation of an insufficient funds check. We applied *Williams* in *United States v. Elliott,* 689 F.2d 178 (10th Cir.1982), and held that submission of a third party insufficient check to the Small Business Administration as payment on a loan was not a "false statement" as proscribed by 15 U.S.C. § 645(a) (1982). We reasoned there could be no implied representation that the maker of the check could have funds on deposit. *Elliott,* 689 F.2d at 180–81.

■ The common thread running through *Williams* and its progeny is that a criminally prohibited statement or representation cannot be formed from an implied representation that the maker of a check will have sufficient funds to pay the check upon presentment. We therefore conclude that, under *Williams,* if a check can form the basis of a representation, it may not do so based upon any implied representation concerning the sufficiency of the maker's bank account to pay the check upon presentment.

■ Turning our attention to the word "representation," it now becomes our task to interpret this word as used in 18 U.S.C. § 1344(a)(2). Where Congress has used terms that have acquired a settled meaning under either equity or common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of those terms. *National Labor Relations Board v. Amax Coal Co.,* 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981). A representation has long been held to consist of words, made orally or in writing, *or* other *conduct* manifesting to another the existence of a material present or past fact. *Rex v. Barnard,* 173 Eng.Rep. 342 (1837) (wearing the cap and gown of an Oxford student purposely produces the false impression that one is such a student; on the basis of that false impression, he obtained property from a tradesman on credit).

In the case before us, the defendants: (1) either knew or should have known that the Dierksen checks described in counts 2 through 47 were not backed by sufficient funds and thus could not be paid upon presentment; (2) knew that when the payor bank would subsequently refuse to accept the Dierksen check for collection, Mr. Bonnett would take the dishonored check and replace it with a new Dierksen check; (3) knew the worthless checks were all drawn on out-of-town and frequently out-of-state banks, thus increasing the time for the worthless checks to be presented to the payor bank and returned to Bank; (4) knew the dishonored checks would be submitted for payment at least twice, thus again increasing the time for the worthless checks to be carried on the books of the bank as being collected funds; (5) knew the worthless checks were treated by Mr. Bernard and Ms. Voigt as if there were funds available to pay the checks upon presentment; and (6) knew immediate credit was given to Mr. Bonnett in his checking account based upon the existence of the worthless checks.

Thus, the defendants by their conduct used the checks as if sufficient funds existed in Dierksen's accounts to pay those checks upon presentment, and thus pur- ˏ

posely produced the false impression necessary to artificially inflate Mr. Bonnett's bank balances upon the books of Bank. This was accomplished to: (1) allow Mr. Bonnett the interest-free use of the depositors' money; (2) allow Bank to make loans to Mr. Bonnett which were prohibited by both federal banking regulations and Bank's own board of directors; and (3) keep the directors of Bank and the federal banking regulators from discovering the existence of the overline and prohibited loans.

Each and every one of the Dierksen checks was issued in a five or six figure amount, each and every one was dishonored, each was presented to the payor bank two times, and immediate credit was given to Mr. Bonnett for these checks even though the defendants knew they were drawn on insufficient funds. The bank examiner testified that when a prudent banker allows a customer immediate credit on a deposited item, any banker would presume that adequate funds are available to pay the deposited item upon presentment for collection. The conduct of the parties in continuing to accept known worthless checks and continuing to grant immediate credit was designed to give the impression, both to the regulatory authorities and to Bank's own board of directors, that the Dierksen checks were in fact drawn on collectable funds, when in fact the defendants knew to the contrary.[1] The misrepresentation in this case was not an implied representation that the checks were good, as in *Williams;* rather it was the conduct of the conspirators in acting as if the checks were good and treating the checks in all respects as if they were drawn on collectable funds, with the knowledge the Dierksen checks were worthless. The Dierksen checks merely served as the paper trail designed to give support to the con-

duct of the parties in the making of prohibited and interest-free loans to Mr. Bonnett.

We hold the conduct of the defendants in their use and treatment of the checks clearly was intended to manifest the fact that such checks were drawn upon collectable funds. It was the conduct of the defendants in utilizing the forty-six worthless checks that gave rise to the false representations, not the checks themselves.[2] The defendants clearly knew the Dierksen checks were not backed by collectable funds and would be dishonored by the payor banks upon presentment. The conduct of the parties was designed to give the impression to Bank that the Dierksen checks were drawn on collectable funds.

### C. The Indictment, Proof, and Instructions

The superseding indictment charged the defendant with violations of 18 U.S.C. § 1344(a), subsections (1) and (2), in the conjunctive as a single crime. For the jury to convict under this indictment it had to find the defendant guilty of both a scheme to defraud and the obtaining of property by means of false pretenses, representations, or promises.

The indictment listed the Dierksen checks and described the insufficient funds checks as being "in furtherance of the scheme to defraud." The indictment did not treat the Dierksen checks as containing an implied representation as to the sufficiency of the maker's account.

We hold the indictment, which was in the statutory language, charged the defendant, Mr. Bonnett, with a crime. The government neither alleged nor inferred the Dierksen checks contained an implied representation that the maker had or would have sufficient funds in his account upon presentment.

---

1. It should be noted that when Bank held one of Mr. Bonnett's checks beyond midnight of the banking day, Bank became liable for its payment, regardless of whether or not it had debited Mr. Bonnett's account. Okla.Stat.Ann. tit. 12A, § 3–506 (West 1963). Ms. Voigt even held Mr. Bonnett's checks in a drawer for several days until Mr. Bonnett's artificially inflated ac-

count balance was sufficient to permit processing of the check.

2. In both the indictment and closing argument, the government characterized the checks as documents written in furtherance of the scheme as a whole, and not as misrepresentations.

■ The trial court instructed the jury in the disjunctive; that is, the jury was instructed that to find the defendant guilty it had to find the defendant knowingly executed or attempted to execute a scheme (1) to defraud, *or* (2) to obtain property by means of false or fraudulent pretenses, representations, or promises. The trial court also instructed that to convict under the "scheme to defraud" the jury first had to find "false representations." Since the indictment charged both crimes, and the evidence in this case supports a conviction under either subsection, logic dictates we must hold the instructions and verdict to be proper.

We further note the jury was instructed that a representation is false if it is untrue when made; the representation must then be known to be untrue by the person making it; the deception need not be written or verbalized words alone, and "the circumstances in which they are used may convey the false and deceptive appearance." This is consistent with our reading of *Williams*. While the instructions were not models of clarity, they were adequate to apprise the jury of the correct law which it was to apply.

We conclude the superseding indictment charged defendants with a crime; there is sufficient proof under the facts of this case to convict under either or both subsections of 18 U.S.C. § 1344; and the verdict raises no questions as to whether or not the defendants were convicted of a non-crime. We hold that neither the indictment nor the proof was based upon an implied representation that Mr. Dierksen had adequate funds to pay the checks, but rather was based upon the defendants' deceptive practices in their use of the worthless checks. In the context of this case, the jury could have found a *scheme* to obtain money by false pretenses or representations within the meaning of 18 U.S.C. § 1344(a)(2), without violating *Williams*.

## II.

### *The Moore Letter*

■ Mr. Bonnett argues the court erred in admitting into evidence Exhibit 861, a letter from Edward L. Moore to the FDIC. We are not persuaded by the argument.

In reviewing the evidentiary rulings of a trial court, we may not reverse in the absence of an abuse of discretion. *United States v. Alexander*, 849 F.2d 1293, 1301 (10th Cir.1988) (citing *United States v. Rodriguez–Pando*, 841 F.2d 1014, 1018 (10th Cir.1988)). Abuse of discretion lies where we develop "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Ortiz*, 804 F.2d 1161, 1164 n. 2 (10th Cir.1986).

Following the closure of Bank, the FDIC was appointed receiver thereof. The FDIC sought to collect from Mr. Moore three loans, totaling $380,000, which Bank had made to him. The government contended, in counts 50, 51, and 54 of the indictment, these loans were nominee loans made to Mr. Moore, when in fact the loans were to Mr. Bonnett. At trial, the government did not call Mr. Moore as a witness, but sought to admit into evidence a letter which Mr. Moore had written to the FDIC wherein he denied any liability for these loans.

The letter written by Mr. Moore to the FDIC reads as follows:

Dear Mr. Glascoe:

I am in receipt of your letter dated March 9th. I am not now, nor have I ever been indebted to the First National Bank of Sapulpa, nor did I ever receive any consideration for any loans at such bank. I have never even had an account with that bank.

/s/ Ed Moore

Mr. Bonnett objected to the offered evidence on two bases: hearsay, and beyond the scope of a stipulation regarding the admission of bank records. The court admitted the letter on the basis that it was included in the stipulation.

The stipulation read as follows:

It is hereby agreed and stipulated by the parties and their attorneys that:

The First National Bank of Sapulpa loan documents, cashier's checks, and ac-

count records of the following individuals and entities:

| | |
|---|---|
| Jack D. Hammer | Edward L. Moore, Jr. |
| James H. Sheets | Jimmie L. Treat |
| J & S Operating, Inc. | Treat Trust Account |
| John J. Kuhnemund | |

are authentic business records of First National Bank of Sapulpa and are admissible in evidence at trial, if they are relevant.

Exhibits E and F. In our view, it is a "close call" whether the letter came within the terms of the stipulation. In admitting the letter, the trial judge made decisions regarding the nature and the ownership of the document. Measured against the standard set forth in *Ortiz*, however, we are not persuaded the trial court erred. We are not left with "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* at 1164 n. 2. Because we hold the trial court did not abuse its discretion in admitting the letter under the stipulation, we do not address the hearsay objection. The hearsay issue is subsumed by the proper admission of the letter under the stipulation.

■ In addition to maintaining error based on hearsay and the scope of the stipulation, Appellant asserts that at the time the government offered the exhibit, it deliberately withheld from the jury, the court, and the defense the fact that the grand jury had issued an indictment charging Mr. Moore with a multi-event bank fraud indictment stemming from these transactions. The indictment was sealed. Appellant claims the failure of the government to inform him Mr. Moore had been indicted for making a false statement amounted to a violation of the exculpatory rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In order to establish a *Brady* violation, a defendant must prove: "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." *Talamante v. Romero*, 620 F.2d 784, 787 (10th Cir.), *cert. denied*, 449 U.S. 877, 101 S.Ct. 223, 66 L.Ed.2d 99

(1980), (citing *Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972)). We are not persuaded that the use of the letter amounted to a *Brady* violation.

First, the letter was not exculpatory evidence for the defense. Appellant argues that the use of the letter by the government negated his defense based upon *United States v. Gens*, 493 F.2d 216 (1st Cir. 1974). The so-called *Gens* defense entails a showing that the nominee loan was not unlawful because the person in whose name the loan was made knew of the loan and was capable of paying it back. In *United States v. Twiford*, 600 F.2d 1339, 1341 (10th Cir.1979), we explicitly refused to follow *Gens*. In our view, it is legally irrelevant whether Mr. Moore knew about the loans, if Bonnett in fact received the money, and this was intentionally concealed from Bank's board of directors and federal regulatory authorities. Consequently, the information that Mr. Moore was lying in his letter was not exculpatory evidence.

Further, we are not persuaded that the letter was material evidence. In *Talamante*, we explained the meaning of materiality in this context.

> Often, the key element is the "materiality" of the evidence suppressed. Proof of materiality is important because *"Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir.1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979). Implicit in this requirement is a concern that the suppressed evidence could have affected the jury's determination of guilt. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

*Id.* at 787. In *Hopkinson v. Shillinger*, 866 F.2d 1185 (10th Cir.1989), we further discussed the standard of materiality as enunciated in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), stating:

> "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the de-

fense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Bagley,* 473 U.S. at 682, 105 S.Ct. at 3384 (Blackmun, J., joined by O'Connor, J.); *see also id.* at 685, 105 S.Ct. at 3385 (White, J., concurring, joined by Burger, C.J., and Rehnquist, J.) (approving "reasonable probability" standard).

*Hopkinson,* 866 F.2d at 1212. In our view, the Moore letter was not material evidence.

Appellant fails to meet his burden of establishing a *Brady* violation in the instant case. Counsel for Mr. Bonnett, in his brief, admits he was aware that Mr. Moore had been indicted although he was not aware of the nature of the indictment. Disclosure of the nature of the indictment would not have altered the result in this case. Consequently, we are not persuaded that the government violated the requirements of *Brady*.

### III.

### *The Evidence of Wrongful Acts*

■ Mr. Bonnett asserts the trial court erred in admitting evidence of Mr. Bonnett's other wrongful conduct. We are not persuaded by this argument.

During its case in chief, the government called Ronald E. Brown, an employee of the Waukomis State Bank. Mr. Brown testified Mr. Bonnett had two accounts with this bank: a savings and a checking account. He testified that in mid–1984 there was seldom enough money to cover the checks written by Mr. Bonnett, and on occasion some of the checks were for $150,-000 or $200,000. One time the total insufficient funds checks outstanding was $400,-000. He testified Mr. Bonnett had written a check and deposited it in Bank in Sapulpa and this check was returned to Sapulpa for insufficient funds. He testified as to a conversation, prompted by the return of this check, between himself and the defendant, Mr. Bernard. His testimony, up to this point, can be characterized as evidence of similar acts during the same time period.

At this point counsel for Mr. Bonnett objected because this line of testimony went "beyond the Court's order on [Fed.R. Evid.] 404(b)." The government responded, stating that statements made by Mr. Bonnett during the same time period is not Fed.R.Evid. 404(b) evidence. The court stated the witness could testify as to the relationship between Bonnett and Bank in Sapulpa and he could testify as to how the account was managed and whether the checks came in, where the deposits were made, "and those matters." Counsel for Mr. Bonnett replied "Okay," and the questioning resumed.

Mr. Brown then testified as to a conversation he had with Mr. Bonnett wherein Mr. Bonnett related that he was bringing Mr. Bernard to Bank in Sapulpa and that he was purchasing stock in Bank. He testified that the directors of the Waukomis bank had ordered Mr. Bonnett's accounts closed, and testified to the circumstances in the early part of 1986 when Mr. Bonnett was allowed to open another account. He testified to Mr. Bonnett's management of this account after it was opened in mid–1986 and how the account activity intensified in September 1986, with deposits coming into his account from Bonnett accounts in other banks, how these deposited checks were frequently returned for insufficient funds, and how the account ended with a negative balance of $340,000. The government then offered the Waukomis Bank statements of Mr. Bonnett for September 4, 1986 to December 3, 1986. At this time Mr. Bonnett's counsel renewed his previous objection, but the court received the evidence. This evidence can generally be characterized as evidence of similar conduct occurring after the offenses charged.

Thereafter, without further objection, Mr. Brown testified as to conversations he had with Mr. Bonnett wherein Mr. Bonnett asked Mr. Brown to borrow $100,000 in Mr. Brown's name and Mr. Bonnett would give him $10,000 and pay back the entire loan plus interest. Mr. Brown testified Mr. Bonnett needed this as he was at his legal lending limit at various banks and they would loan him no more money. This evi-

dence may be characterized generally as showing knowledge and intent. Mr. Brown continued his testimony as to other matters, without further objection.

Mr. Bonnett contends he was prejudiced by this testimony, and that the Bank of Waukomis transactions occurred after the Bank of Sapulpa transactions and were therefore not indicative of the intent element but rather were offered to make Mr. Bonnett out as a "bad character." In short, Mr. Bonnett contends these acts were too remote in time and unrelated to the transactions with which he was charged. Mr. Bonnett cites and relies upon *Niederluecke v. United States*, 21 F.2d 511 (8th Cir.1927), and *Paris v. United States*, 260 F. 529 (8th Cir.1919). We disagree and hold the evidence was properly admitted.

Fed.R.Evid. 404(b) provides that evidence of other crimes, wrongs or acts is not admissible to prove the character of a person to show he acted in conformity therewith. However, such evidence may be admissible to show knowledge, motive or intent on the part of the actor. *United States v. Cummings*, 798 F.2d 413, 417 (10th Cir.1986) (citing *United States v. Bridwell*, 583 F.2d 1135, 1140 (10th Cir.1978)). The government offered the evidence to show Mr. Bonnett's intent to defraud Bank, his motive behind the scheme, the method by which his fraudulent scheme was implemented, and his knowledge and intent to implement the scheme.

Evidence of other crimes, wrongs or acts usually involves previous conduct, but under certain circumstances, conduct subsequent to the offense charged is admissible. *Cummings*, 798 F.2d at 417 (citing *United States v. Cook*, 745 F.2d 1311, 1317–18 (10th Cir.1984), *cert. denied*, 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985), and *Bridwell*, 583 F.2d at 1140).

"When evidence of other crimes, wrongs or acts is relevant and tends to prove an issue such as knowledge, the trial court must weigh the probative value of the evidence against the prejudice inherent in such evidence. Fed.R.Evid. 403." *Cummings*, 798 F.2d at 418. It is only where the unfair prejudice substantially out-

weighs the probative value that such evidence must be excluded, Fed.R.Evid 403, and this determination is left to the discretion of the trial judge. *Cook*, 745 F.2d at 1318. Here, the trial judge found that any unfair prejudice did not outweigh its probative value and gave a proper limiting instruction.

In our view, the disputed evidence tends to show the defendant had established a pattern, practice, and method of obtaining the illegal use of bank funds for his own gain. This evidence likewise demonstrates Mr. Bonnett's knowledge and intent, and reduces the possibility that Mr. Bonnett's activities stemmed from some innocent reason. The closeness in time and the similarity in conduct were matters left to the trial court, and his decision will not be reversed absent a showing of abuse of discretion. *Cummings*, 798 F.2d at 418. We find no abuse of discretion and conclude the actions of the trial court were proper.

## IV.

### *Denial of Opportunity to Impeach*

At trial, Mr. Bonnett sought to question an FBI agent regarding statements allegedly made to him by the two prosecution witnesses, Mr. Treat and Mr. Hammer. Mr. Bonnett asserts the trial court erroneously refused his offer of proof with respect to Mr. Treat and Mr. Hammer, thereby prejudicially denying him the opportunity to impeach two of the government's witnesses. We review the trial court's rulings on the admission and exclusion of evidence under the abuse of discretion standard, *United States v. Alexander*, 849 F.2d 1293, 1301 (10th Cir.1988), and are not persuaded by Mr. Bonnett's argument.

■ During the government's case in chief, Mr. Treat testified regarding nominee loans obtained by him from Bank for Mr. Bonnett. Mr. Treat stated Mr. Bernard had told him an attorney by the name of Tom Nally advised Mr. Bernard the loans were legal. The government then called Mr. Nally to the witness stand, where he denied giving any such advice to Mr. Bernard. On cross-examination, coun-

sel for Mr. Bonnett did not ask about or confront Mr. Treat with the prior inconsistent statement he may have made to an FBI agent that the advising attorney's name was "Steve." Furthermore, counsel for Mr. Bonnett did not recall Mr. Treat for such purpose, although the trial court issued a subpoena for him at Mr. Bonnett's request explicitly for that purpose.

When co-defendant Mr. Bernard called the FBI agent to the witness stand and attempted to question him about pre-trial statements made by Mr. Treat, the government objected to the questions on the basis of hearsay. The trial court sustained the objection, ruling the questions were an attempt to impeach a witness through the testimony of another without first confronting the witness with the inconsistency. Subsequently, counsel for Mr. Bonnett made an offer of proof that Mr. Treat had told the FBI agent Mr. Bernard told him (Mr. Treat) he had received the advice of counsel named "Steve" that the nominee loans were legal. The court refused to permit Mr. Bonnett to pursue this line of questioning.

Mr. Bonnett asserts the testimony of the FBI agent relating to the prior inconsistent statements was clearly admissible under Fed.R.Evid. 801(d)(1), which provides in part as follows:

> (d) Statements which are not hearsay. A statement is not hearsay if:
>
> > (1) Prior statement by witness. The declarant testifies at the trial ... and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding. . . .

In our view, the testimony is not within Rule 801(d)(1) for the reason that the prior inconsistent statement was not "given under oath ... at a trial, hearing, or other proceeding." The prior statement given to the FBI may or may not have been a crime under 18 U.S.C. § 1001, knowingly making a false statement on a matter within the jurisdiction of a department or agency, but

such is of no consequence to our disposition of the issue. Further, Rule 801(d)(1) states the declarant must be *subject* to cross-examination." (Emphasis added.)

Under Fed.R.Evid. 613(b) and Fed.R. Evid. 801(d)(1), before a prior inconsistent statement may be introduced, the party making the statement must be given the opportunity to explain or deny the same. In our view, to admit prior inconsistent statements of the witness when he was not first confronted denies the trier of fact the opportunity to observe his demeanor and the nature of his testimony as he denies or explains his prior testimony.

Mr. Bonnett relies upon four cases to support his argument that a witness need not be confronted with his prior inconsistent statement when the prior statement is to be used to attack the credibility of an out-of-court statement. These cases are *United States v. Wuagneux*, 683 F.2d 1343 (11th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983), which involved the admissibility of evidence under Fed.R.Evid. 806 to impeach a hearsay statement admitted at trial; *United States v. Rogers*, 549 F.2d 490 (8th Cir.1976), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977), where the court ruled that the witness had been afforded an opportunity to explain or deny his former statement; *United States v. Castro–Ayon*, 537 F.2d 1055 (9th Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 501, 50 L.Ed.2d 594 (1976), where the court ruled that an immigration interrogation was "another proceeding" under Rule 801(d)(1) because, among other formalities, the witness was sworn; and *United States v. Day*, 789 F.2d 1217 (6th Cir.1986), where the court rejected the prior statements as they were not made under oath at a formal proceeding. These cases are not persuasive and are clearly distinguishable.

■ Mr. Bonnett also asserts as error the trial court's refusal of an offer of proof regarding a purported inconsistent statement made by Mr. Hammer. Mr. Hammer testified during the government's case in chief, and admitted he had made a false affidavit to aid Mr. Bonnett in a civil suit.

He further testified he was to be paid by Mr. Bonnett for making this false affidavit. In a lengthy compound question, counsel for Mr. Bonnett asked Mr. Hammer if he had told the FBI agent it was really Mrs. Hammer who was making the demand for payment. Mr. Hammer replied: "That's possible." [3]

During trial, Mr. Bonnett sought to return an FBI agent to the witness stand for the purpose of testifying that during a pretrial interview Mr. Hammer had told him it was his wife's idea he be paid for making the false affidavit. The court refused to permit Mr. Bonnett to pursue this line of questioning.

Mr. Bonnett argues the evidence of the prior statement was admissible under Fed. R.Evid. 801(d)(1). Again, we are not persuaded. The prior statements of Mr. Hammer were not made under oath, nor were they made at a trial, hearing, or other proceeding. An FBI interview of a witness or criminal suspect is not "another proceeding" under Rule 801(d)(1).

■■■ Further, we do not see the inconsistency claimed. He did not deny he may have told the FBI agent Mrs. Hammer was the instigator of the agreement for payment; he responded: "That's possible." In his testimony, Mr. Hammer further explained Mr. Bonnett, Mr. Hammer, and Mrs. Hammer all agreed to the monetary payment. Because he did not deny he may have told the FBI agent the payment was his wife's idea, any further testimony of the FBI agent merely would have been cumulative to that of the witness. In *United ed States v. McCowan*, 471 F.2d 361, 364 (10th Cir.1972), we declined to find prejudicial error in the trial court's determination that the offered evidence did not contradict the witnesses testimony. Although we did not expressly so hold in *McCowan*, we agree with the Seventh Circuit that the determination as to whether the prior testimony is truly inconsistent is a matter within the discretion of the trial judge. *United*

*States v. Jones*, 808 F.2d 561, 568 (7th Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1630, 95 L.Ed.2d 203 (1987).

In light of the entire record, we are not persuaded that the trial court abused its discretion in refusing to permit this line of inquiry.

AFFIRMED.

---

3. Although in Mr. Bonnett's brief, at 34, he indicates that Mr. Hammer denied under oath that he had told the FBI agent the idea for the payment of money had originated with his wife, and that Mr. Hammer's testimony at trial was in direct conflict with his earlier statement, the record does not bear out his claim.