974 F.2d 1346
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas L. WAUGH, Defendant-Appellant.
 No. 91-5101.
 United States Court of Appeals, Tenth Circuit.
 Aug. 14, 1992.
 
 Before SEYMOUR, SNEED* and JOHN P. MOORE, Circuit Judges.
 ORDER AND JUDGMENT**
 SNEED, Circuit Judge.
 
 
 1
 Defendant-Appellant Thomas L. Waugh appeals his conviction for seven counts of bank fraud pursuant to 28 U.S.C. § 1344(1). Waugh's conviction arose out of a fraudulent check-writing scheme that Waugh alleges he undertook in an attempt to rescue himself from debt. Waugh contends that the conduct proven by the government did not constitute a "scheme to defraud" under the statute, that the seven-count indictment was multiplicitous, that the district court made improper evidentiary rulings, and that the government, by failing to reveal that its key witness was under FDIC investigation, violated its duty to disclose exculpatory evidence. We affirm in part and remand.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 From 1985 through December 1989, Waugh, who was involved in restaurant and hotel businesses in Oklahoma, Tennessee, and Texas, was a customer of the Commercial National Bank of Tulsa, Oklahoma ("CNB"). Throughout this period Waugh routinely wrote overdrafts in large amounts against his CNB accounts. Waugh alleges that he was led into this practice by CNB president John A. Baker, who suggested that the overdrafts be used to effect unauthorized "loans" from CNB in instances in which Baker found it burdensome to seek proper or timely loan authorization from CNB's board of directors. In 1987, CNB's board of directors instructed Baker to cease funding overdrafts for Waugh. Nevertheless, the overdraft activity continued and escalated.
 
 
 3
 Between April and December 1989, the period that was the subject of Waugh's indictment, Waugh knowingly wrote numerous unfunded checks drawn against three separate accounts controlled by Waugh at two financial institutions located in Austin, Texas. Waugh deposited these checks into two separate accounts at CNB, Waugh Development Corporation and Tom Waugh Investments. After CNB granted immediate credit for the unfunded deposits, Waugh withdrew money from his CNB accounts. Each time a CNB representative informed him that an unfunded check had been returned, Waugh would "cover" the returned item by writing, substituting, and depositing another unfunded check at CNB. Most of the checks eventually were made good, usually within a thirty-day period.
 
 
 4
 On August 9, 1990, Waugh was indicted on seven counts of bank fraud based on seven unfunded checks drawn on various days in December 1989 against accounts at the Texas financial institutions and deposited in Waugh's CNB accounts. The bad checks resulted in a financial loss to CNB of $122,397.22. A jury trial was held in April 1991, and the jury found Waugh guilty on all seven counts.
 
 
 5
 Waugh maintains that his bad check scheme represented his sincere attempt to manage a forced transition away from CNB. Waugh relates how shocked he was when, at a meeting in June 1989, Baker informed him that he must withdraw his accounts from CNB. Waugh had developed a longstanding and close personal relationship with Baker, and did not know how he could keep his business going if he had to leave CNB immediately. He wrote the checks for which he was later prosecuted, he says, in order to gain sufficient time to conclude his CNB debts and to establish a new relationship with the Texas banks. Apparently, Waugh assumed that this was Baker's understanding as well; in a December 1989 meeting with Baker, Waugh explained that he assumed Baker was aware of his overdrafts but was granting him an informal extension of credit to allow him time to liquidate various assets, an assumption which Baker testified he did not share. Waugh emphasizes that he always intended to, and in most instances did, pay back the money he took. He points out that of some 42 unfunded checks presented by the government at trial, only seven remained unpaid. In short, Waugh avers that his intentions were good. Nevertheless, for the reasons discussed below, his conviction was proper.
 
 II.
 JURISDICTION AND STANDARDS OF REVIEW
 
 6
 We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We review de novo the questions whether a particular statute proscribes the conduct proven and whether an indictment under the statute is multiplicitous. See United States v. Bonnett, 877 F.2d 1450, 1454 (10th Cir.1989). We review the district court's evidentiary rulings for abuse of discretion, id. at 1458, in light of the record as a whole, Boren v. Sable, 887 F.2d 1032, 1034 (10th Cir.1989), and review for clear error the factual determination underlying a court's denial of a claim of attorney-client privilege. See United States v. Anderson (In re Grand Jury Subpoenas ), 906 F.2d 1485, 1488 (10th Cir.1990).
 
 III.
 DISCUSSION
 
 7
 Waugh raises several issues in his appeal. He contends that the conduct proven by the government did not constitute a "scheme to defraud" under the statute because his actions with regard to CNB amounted neither to check kiting nor to affirmative misrepresentation. In addition, he urges that the seven-count indictment was multiplicitous because it treated each bad check as a separate act in furtherance of the fraudulent scheme. Waugh also contends that the district court improperly excluded an analysis of his history of overdraft activity at the bank and improperly admitted testimony of Waugh's former attorney, James C. Pinkerton, in violation of the attorney-client privilege. Finally, Waugh states that the government violated its duty to disclose exculpatory evidence by failing to reveal that its key witness was under FDIC investigation. We address these contentions seriatim.
 
 
 8
 A. Waugh's repeated deposits of unfunded checks constituted a scheme to defraud a federally insured commercial bank in violation of 18 U.S.C. § 1344(1).
 
 
 9
 To convict a defendant under subsection (1) of 18 U.S.C. § 1344, the government must prove that the defendant knowingly executed a scheme or artifice and that the scheme defrauded the financial institution. Bonnett, 877 F.2d at 1453. The focus of section 1344(1), unlike that of section 1344(2), is on the intended end result of the criminal scheme and not the means applied to effect that result. See United States v. Cronic, 900 F.2d 1511, 1513-14 (10th Cir.1990) (interpreting the mail fraud statute, 18 U.S.C. § 1341). The government is not required to prove that the defendant affirmatively misrepresented through oral or written statements that he had sufficient funds to pay the checks, or that the defendant took special precautions to conceal his scheme. Nor need the government prove that the defendant employed the classic check-kiting scheme described in Williams v. United States, 458 U.S. 279, 281 n. 1 (1982), or any other scheme specifically described in the case law. The government need only prove that the defendant knowingly engaged in a deceptive practice of using unfunded checks. In particular, where a defendant repeatedly writes checks knowing they are insufficiently funded, the continued use of such checks constitutes a scheme to defraud. See Bonnett, 877 F.2d at 1455. "For purposes of [section] 1344(1), the relevant inquiry is whether defendant knowingly had insufficient funds in the accounts being utilized on the date the checks were written." United States v. Ratchford, 942 F.2d 702, 704 (10th Cir.1991), cert. denied, 112 S.Ct. 1185 (1992).
 
 
 10
 Applying these standards, we have no difficulty concluding that Waugh violated section 1344(1). He knowingly and intentionally deposited unfunded checks and "covered" them later with more unfunded checks. By this practice CNB was defrauded and suffered a loss in excess of $120,000. It is immaterial that Waugh may have believed that he was acting with Baker's approval, or that CNB might have learned through inquiry upon the Texas banks that Waugh's checks were unfunded. It is likewise immaterial that Waugh may have intended eventually to pay the money back. Waugh's intent to "borrow" money from CNB interest-free and without authorization was sufficient criminal intent to sustain his conviction under section 1344(1).
 
 
 11
 B. The seven-count indictment charging Waugh with a separate count for each check written in furtherance of a fraudulent scheme was not multiplicitous.
 
 
 12
 Waugh argues that his seven-count indictment was multiplicitous because he was charged separately for each unfunded check written. This argument is meritless. The statutory language "plainly and unambiguously allows charging each execution of the scheme to defraud as a separate act." United States v. Poliak, 823 F.2d 371, 372 (9th Cir.1987), cert. denied, 485 U.S. 1029 (1988); accord United States v. Schwartz, 899 F.2d 243, 248 (3d Cir.), cert. denied, 111 S.Ct. 259 (1990). We hold that each deposit made by Waugh constituted a separate execution of Waugh's scheme to defraud CNB and a separate violation of section 1344(1).
 
 
 13
 United States v. Lemons, 941 F.2d 309 (5th Cir.1991), is distinguishable. In that case, the defendant's scheme was not, and could not be characterized as, a check-writing scheme. Rather, the scheme involved the diversion of funds from a real estate loan made by the financial institution over which the defendant presided. Loan funds in the amount of $212,000 were routed from a real estate broker to the defendant by way of a third party, who wrote the defendant several checks for bogus consulting fees and the like. Several checks were used, rather than one, in order to evade detection of the fraudulent scheme. The Fifth Circuit held that these checks could not each serve as the basis of separate counts under 18 U.S.C. § 1344. "[T]here was but one scheme and one execution. The movement of the benefit to Lemons, although in several separate stages or acts, was only part of but one performance, one completion, one execution of that scheme." Id. at 318. By contrast, in the instant case, the very object of the scheme was to write fraudulent checks as needed, and numerous checks were written not to conceal a single larger transaction that effectively had already been completed, but from time to time as Waugh's needs dictated.
 
 
 14
 C. The district court did not abuse its discretion in excluding evidence of an analysis of Waugh's history of overdraft activity.
 
 
 15
 Waugh sought to introduce into evidence an analysis of his CNB accounts performed by one Patrick Walters, a former Internal Revenue Service Agent. The analysis concerned the amount of overdraft activity occurring between 1985 and 1989, and, according to Waugh, was intended to show that he had a large number of overdrafts during the period and paid substantial overdraft fees for the privilege.
 
 
 16
 We find that the district court acted within its discretion under Fed.R.Evid. 403 in refusing to admit the analysis of Waugh's checking accounts prior to 1989. The indictment referred only to two of the six accounts analyzed by Walters and related exclusively to a period beginning in April 1989. The district court found that the exhibit was at best extremely confusing and at worst meaningless. Moreover, Waugh was unable to vouch for the accuracy of certain portions of the exhibit. Under these circumstances, the court's decision to exclude the evidence was not an abuse of discretion.
 
 
 17
 We note that the exclusion of Walter's analysis did not affect Waugh's substantial rights. Waugh was not prevented from introducing testimonial evidence regarding his overdrafts prior to 1989. Waugh has the burden of demonstrating that his substantial rights were affected by the court's evidentiary ruling, K-B Trucking Co. v. Riss Int'l Corp., 763 F.2d 1148, 1156 (10th Cir.1985); see Fed.R.Evid. 103(a)(1), and he has failed to meet this burden. Indeed, Waugh's overdraft history at CNB was never a contested issue, and the frequency with which he overdrew his CNB accounts was conceded by the government. It is difficult to imagine that the excluded exhibit would have carried a high probative value had it been admitted.
 
 
 18
 D. The district court did not commit clear error in admitting allegedly privileged testimony from Waugh's former attorney.
 
 
 19
 Waugh argues that the admission of testimony from James C. Pinkerton, Waugh's former attorney, was a violation of Waugh's attorney-client privilege. This argument lacks merit.
 
 
 20
 The attorney-client privilege protects confidential communications made by a client to an attorney in order to obtain legal assistance from the attorney in his or her capacity as a legal advisor. Fisher v. United States, 425 U.S. 391, 403 (1976). The privilege is narrowly construed, Dorokee Co. v. United States (In re Grand Jury Subpoena Duces Tecum ), 697 F.2d 277, 278 (10th Cir.1983), and does not apply to communications between attorney and client in which the attorney is acting as a participant in the transaction rather than as a legal advisor. See Young v. Taylor, 466 F.2d 1329, 1332 (10th Cir.1972). Also, the party claiming the attorney-client privilege has the burden to establish it. Dorokee, 697 F.2d at 279.
 
 
 21
 With regard to the communication at issue here, the district court properly could find that Waugh approached Pinkerton for investment rather than legal advice. Pinkerton's testimony reflected his participation as an investor and not as a lawyer:
 
 
 22
 I think probably I volunteered to become an investor as much as I was sought as an investor. I had been representing Mr. Waugh for approximately six months in an attempt to buy that hotel, but I was not an investor during those six months or even a potential investor. In the last of August 1989, the other investors who were to put up the money appeared to be backing out of the deal, so it looked like he didn't have what you'd call the money partners to buy the motel. At that time rather than see him lose the deal I said that perhaps I knew a person or two who might invest and we might be able to get some new investors and make the deal.
 
 
 23
 ...
 
 
 24
 I said to [Waugh], well, we'll need to borrow that $20,000 from Commercial Bank. And he said to me, 'John Baker won't let me have any more money.'
 
 
 25
 The district court did not commit clear error in finding that the communications between Pinkerton and Waugh were not privileged.
 
 
 26
 E. We decline to reach the issue whether the government violated its duty to disclose exculpatory evidence by failing to reveal that its key witness was under FDIC investigation.
 
 
 27
 The final issue presented for review is whether the government suppressed material exculpatory evidence in contravention of Brady v. Maryland, 373 U.S. 83, 87 (1963). Waugh argues that the government improperly failed to disclose that its key witness, John Baker, was under FDIC investigation for alleged breaches of fiduciary duty to American Bank, where Baker worked prior to joining CNB. Apparently Waugh believes that the fact of Baker's investigation shows that Baker may have breached his fiduciary duties at CNB by extending credit to Waugh against the instruction of the Board of Directors. Waugh theorizes that disclosure of Baker's FDIC investigation would tend to lessen the likelihood that the jury would convict Waugh for bank fraud.
 
 
 28
 We decline to pass on this issue, which was raised after the notice of appeal was filed. On the basis of the record before us we cannot say that it is completely without merit. A decision as to its merits must be made initially by the district court, before which Waugh's second motion for a new trial is now pending.
 
 
 29
 The district court stayed action on Waugh's new trial motion pending this appeal. Its statement that it lacked jurisdiction to consider the motion was error. United States v. Cronic, 466 U.S. 648, 667 n. 42 (1984). Nevertheless, had it simply declined to certify its intent to grant or deny the motion, it would have acted properly within its discretion. United States v. Blanton 697 F.2d 146 (6th Cir.1983); 8A James W. Moore et al., Moore's Federal Practice p 33.02[d] (2d ed. 1992). Accordingly, we remand to afford the court an opportunity to rule on the motion. FedR.Crim.P. 33. We affirm the decision below in all other respects.
 
 
 30
 AFFIRMED IN PART and REMANDED.
 
 
 
 *
 Honorable Joseph T. Sneed, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for the purposes of establishing the doctrines of law of the case, res judicata or collateral estoppel. 10th Cir.R. 36.3