Willis Allen PARKER, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18954.

United States Court of Appeals
Fifth Circuit.

Dec. 13, 1961.

L. Hugh Kemp, Dalton, Ga., for appellant.

Floyd M. Buford, U. S. Atty., Sampson M. Culpepper, Asst. U. S. Atty., Macon, Ga., for appellee.

Before TUTTLE, Chief Judge, and CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal presents the basic question whether there was sufficient evidence to sustain Parker's conviction for the interstate transportation of a check knowing it to have been forged. 18 U.S.C.A. § 2314. Parker, tried and convicted jointly with Robert Hunnicutt, alone appeals. His other confederates, Patricia Hunnicutt and Virginia Bullard, after a plea of guilty, were the principal Government witnesses.

The essential element of transportation came from the transmission of the check through the usual trade and banking channels from Georgia, where the check was written and cashed, to Alabama where the drawee bank was located. Admittedly Parker did not write, or prepare, or draw, or handle the check. He did not, therefore, forge the drawer's signature. What he did, and all that he did, viewed most favorably to the Government's case, was to (a) make the suggestion to his confederates that they should write another check on Manning, the purported drawer, (b) furnish the

ball point pen with which it was written and (c) share substantially in the loot. We may assume, without deciding, that this was adequate to make him a principal under 18 U.S.C.A. § 2.

We can likewise assume that the jury had sufficient basis for finding that Parker joined with others in consciously uttering a check knowing that it was not signed by the drawer and that the law imputed to him the expectation that in the course of collection it would be sent interstate from Georgia to Alabama.[1] But that is far from holding, on this record, that Parker knew that it was a check which had been "falsely made, forged, altered, or counterfeited * *."[2]

Consideration of that vital issue requires an examination of the evidence which portrays, to be sure, dissolute conduct meriting, we suppose, strong moral censure but which itself reflects why Parker's actions do not support the inference that he knew that the drawer would treat the signature as unauthorized and hence, forged or false.[3]

The purported drawer was no stranger to these four, nor were they strangers to each other. Parker, apparently an itinerant encyclopedia salesman, had recently met Virginia Bullard and shortly thereafter moved into her apartment. Patricia Hunnicutt, who was actually her friend although each sometimes represented themselves to be sisters, also shared this apartment at least now and then. And at least on some occasions Robert Hunnicutt, presumably her husband from whom she was nominally separated and from whom she ultimately got a divorce, spent some nights there too. In the meantime, an unusual relationship had been struck up between Manning and Patricia. He was a resident of an Alabama town where his family resided. While in this Georgia community in connection with some construction work with which he was connected, he met Patricia. While each of the two refute categorically the implication of any immoral conduct, it was uncontradicted that he had, over the course of a few months, given her approximately $700. One such gift was in the neighborhood of $125 and was sent by a telegraph money order in response to some urgent plea made by telephone to him. This generosity was well known to her friends, Parker, Virginia and Robert. Indeed, he was looked upon as a source of funds presumably for one or all of this group. As all knew, some weeks prior to the check involved in this trial, and while Robert was in the local jail for some reason, a check for a substantial sum was written out on Manning's account. Manning's name was signed to the check in the writing of Virginia Bullard. This check was successfully cashed and, it turns out, upon presentment to the drawee bank it was honored. At least three other checks were similarly written. Each was successfully circulated, cashed and honored on presentment. In the meantime the friendship between Manning and Patricia continued. There was, to be sure, a momentary outcropping of a troubled conscience since Patricia and Virginia did make a trip on a Sunday to visit

---

1. Roddy v. United States, 7 Cir., 1958, 262 F.2d 308, cert. denied 359 U.S. 949, 79 S.Ct. 734, 3 L.Ed.2d 682; Hubsch v. United States, 5 Cir., 1958, 256 F.2d 820; Moore v. United States, 5 Cir., 1958, 250 F.2d 658, cert. denied 356 U.S. 956, 78 S.Ct. 998, 2 L.Ed.2d 1071; 363 U.S. 813, 80 S.Ct. 1251, 4 L.Ed.2d 1155; Loman v. United States, 8 Cir., 1957, 243 F.2d 327; Fowler v. United States, 5 Cir., 1957, 242 F.2d 860; Rickey v. United States, 5 Cir., 1957, 242 F.2d 583; Pereira v. United States, 5 Cir., 1953, 202 F.2d 830, aff'd 347 U.S 1, 74 S.Ct. 358, 98 L.Ed. 435.

2. " * * * Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities, knowing the same to have been falsely made, forged, altered, or counterfeited; * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both. * * *" 18 U.S.C.A. § 2314.

3. Johnson v. United States, 5 Cir., 1953, 207 F.2d 314, cert. denied 347 U.S. 938, 74 S.Ct. 632, 98 L.Ed. 1087.

Manning at his home in Alabama while his family was away. Their purpose, so they testified, was to tell him specifically about these four checks. They returned to Georgia without discussing these checks. Despite this faintheartedness which kept them from making a clean breast of these actions, there was no evidence to indicate that, in the face of his somewhat unorthodox relationship to Patricia, Manning would treat these checks as unauthorized, hence forged, when and as the specific facts might become known to him.

It was in this setting that the check of October 10, 1960, was written. Each of the four was in need of money. Virginia and Patricia owed two months' rent and were being threatened with eviction. Parker and Robert had checks at various establishments including liquor stores which had been returned. In this council of mutual despair Parker not unnaturally thought of Manning. He suggested that they should write another check on Manning. All seemed to concur in this proposal and the disagreement, mild as it was, concerned merely the amount and the method by which it should be cashed. After ascertaining through a telephone call that the rental agent would cash the check after deducting a part for rental then in arrears, this group set out in Virginia's automobile. While en route Robert, in the rear seat with Patricia, wrote the check involved here. The check was cashed by the rental agent and the proceeds variously distributed among the four.

The Government established overwhelmingly that the four were engaged in this act of writing, passing, and cashing the check drawn ostensibly by Manning. There was also proof enough that Manning had not given express authority to Patricia or anyone else to sign his name on checks drawn on his account. But in these peculiar circumstances the absence of express authorization did not of itself make out a forgery. There was, to be sure, some evidence of remarks made by one or the other of the four, during the moments the check was being written out, showing some apprehension. But in this equivocal record this supported merely an inference that this had to do with enhancing the cashability of the check, and not a concern that they were doing something which would be renounced by Manning.

This record established affirmatively that Manning had been a generous source of funds to Patricia. It later turned out that the drawee bank had simply honored the four previous checks without bringing them specifically to Manning's attention. Nevertheless, so far as the evidence here is concerned, there is nothing to indicate that at the time the October 10 check was written out, Parker had reason to believe that Manning would dishonor this check or treat it in a way different from the previous checks written by Virginia or Robert.[4] Whatever inferences of such knowledge might have been drawn, they were too equivocal on this unique record to establish the vital link. Riggs v. United States, 5 Cir., 1960, 280 F.2d 949; Riggs v. United States, 5 Cir., 1960, 280 F.2d 750; Cuthbert v. United States, 5 Cir., 1960, 278 F.2d 220.

The District Court should therefore have granted the motion for judgment of acquittal, F.R.Crim.P. 29, 18 U.S.C.A. Consequently the cause must be reversed and remanded for a new trial if there is a satisfactory showing that additional evidence will be available to overcome the deficiencies in the proof offered on the first trial. In the event a new trial is ordered, it is not likely that any of the procedural errors here complained of would reoccur and consequently, no discussion of such points is warranted.

Reversed and remanded.

---

4. The Trial Court recognized that there was a substantial basis in this unusual record for this unique defense. He submitted it carefully to the jury in the charge.