**UNITED STATES, Appellee,**

v.

**N. John FONTANA, II, Defendant, Appellant.**

**No. 91–1529.**

United States Court of Appeals, First Circuit.

Heard Sept. 11, 1991.

Decided Oct. 30, 1991.

---

James L. Sultan, with whom Rankin & Sultan, Boston, Mass., was on brief, for defendant-appellant.

Peter E. Papps, First Asst. U.S. Atty., with whom Jeffrey R. Howard, U.S. Atty., Concord, N.H., was on brief, for appellee.

Before TORRUELLA, Circuit Judge, TIMBERS,* Senior Circuit Judge, and CYR, Circuit Judge.

TIMBERS, Circuit Judge:

Appellant N. John Fontana appeals from a judgment of conviction for bank fraud, 18 U.S.C. § 1344 (1988), and for interstate transportation of falsely made securities, 18 U.S.C. § 2314 (1988).

Fontana's conviction results from a check kiting scheme in which he maintained two distinct checking accounts on behalf of Medical Dental Convenient Care, Inc., a corporation of which he was then President, and in which he wrote checks drawn on one account containing insufficient funds and deposited those checks in the other account. That activity resulted in inflated checking account balances in both banks.

Fontana raises three issues on appeal: first, whether his conviction under § 1344 can stand in light of the government's failure to prove fraudulent misrepresentation; second, whether his convictions under § 2314 can stand, in that his own signature, not a forgery, appeared on the checks in question; and third, whether the district court erred in refusing to suppress incriminating statements made by Fontana after he asserted his Fifth Amendment right to counsel.

For the reasons which follow, first, we affirm the bank fraud conviction (Count One) pursuant to § 1344, holding that the indictment and the jury charge both were adequate and that neither required the government to bear the burden of proving fraudulent misrepresentation in establishing the existence of a scheme or artifice to defraud. Second, we affirm Fontana's conviction pursuant to § 2314, since as a matter of law his activity constituted the transportation of "falsely made securities"; but we hold, with the government's consent, that only Counts Two and Thirteen may be

* Of the Second Circuit, sitting by designation.

affirmed; we vacate the convictions on the remaining twenty counts on which Fontana was convicted; but we hold it is unnecessary to remand for resentencing, since Fontana was sentenced under the Sentencing Guidelines, with all counts grouped and the ultimate sentence being based on the amount of loss. See Castle v. United States, 368 U.S. 13 (1961) (per curiam) (applying the holding in Bell v. United States, 349 U.S. 81 (1953)). The penalty assessment is reduced to $150. Third, we affirm the district court's refusal to suppress Fontana's incriminating statements.

I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

Fontana was the President of Medical Dental Convenient Care, Inc. (Medical Dental), a corporation doing business in New Hampshire. Fontana and his wife, Terri Fontana, were the sole stockholders of the corporation. From February 1, 1989 to May 31, 1989, as President of that corporation, Fontana maintained a checking account in the name of the corporation at the Numerica Savings Bank (Numerica), located in Manchester, New Hampshire. Terri Fontana was the sole authorized signatory of that account according to signature cards maintained by Numerica. Fontana maintained a second checking account in the name of Medical Dental at the State Street Bank (State Street), located in Boston, Massachusetts. Fontana's son, N. John Fontana III, the former president and treasurer of Medical Dental, was the sole signatory of that account according to the State Street signature card. All deposits were insured by the Federal Deposit Insurance Corporation.

On August 15, 1990, a federal grand jury indicted Fontana, charging bank fraud by check kiting in Count One, in violation of 18 U.S.C. § 1344. Counts Two through Twenty Four charged that this activity violated 18 U.S.C. § 2314, which prohibits the

knowing transportation of falsely made securities in interstate commerce.

We believe that a general overview of the banking process may be helpful in understanding the operation of the check kiting scheme. A check is deemed "uncleared" until it has travelled through the entire check processing cycle. This cycle is best illustrated by example: during a normal cycle, a check drawn on the Medical Dental account in State Street would be presented by Fontana for deposit in the corporation's account maintained in Numerica. The check then would be forwarded from Numerica to a check processing center, and ultimately back to State Street, the bank of origin, for payment out of the Medical Dental checking account there. This process normally would require several days from the date of deposit in Numerica to the date of presentation and transfer of funds from the State Street account to the Numerica account.

At the time of deposit, Numerica has discretionary power to await completion of the full processing cycle before releasing to Medical Dental the funds represented by the check, where the deposits exceeded $5,000. For certain valued customers, however, Numerica maintains a policy which allows it to release funds represented by the amount of the check prior to the close of the processing cycle, essentially resulting in an advance or loan in the amount of the check to Medical Dental's Numerica account. This early release also is known as "drawing from uncollected funds". Numerica's advance or loan would then be recouped once the check had completed the processing cycle and Numerica had collected the funds from Medical Dental's State Street account. State Street also maintains a similar policy of early payment for certain of its customers.

For checks drawn on the State Street account when the account had adequate funds to cover the amounts of the checks, the advance by Numerica raised no problems. For checks drawn on the State Street account when the account had insufficient funds, however, Numerica's decision prematurely to advance funds to the Medical Dental account left Numerica with no means of recouping or repaying the advances. The bank's only recourse in such a case was to pursue a civil remedy against the depositor, Medical Dental, who had reaped the immediate benefit of the advance.

In the instant case, the government charged that Fontana wrote checks drawn on the State Street account when that account had insufficient funds to cover the checks and subsequently deposited those checks in the second account maintained at Numerica. In view of the accelerated release of funds under Numerica's internal policy, the balance established in the Numerica account immediately reflected the new deposit. Fontana then would write a check drawn on the inflated Numerica account and deposit that check in the State Street account. The latter account would reflect immediately the new deposit because of State Street's policy of premature deposit of funds in that account. By a synchronized schedule of deposits, the account balances appeared larger than the actual balances as of each date of deposit. This enabled Fontana for relatively short periods to use bank funds advanced to him as his own but which were not his.

The checks drawn on insufficient funds involved in this scheme totalled approximately $18.7 million. An overdraft clerk at State Street first uncovered this scheme when it became clear that Medical Dental's account repeatedly was drawing from the bank's uncollected funds—a pool designated to cover checks which had not cleared the check processing cycle. This resulted in repeated internal overdraft notices to certain State Street officials. In response, State Street began to return checks drawn on the Medical Dental account for insufficient funds. This terminated the discretionary advance of funds and required that the checks pass through the processing cycle before release of deposited funds in Fontana's account. As a result, State Street was able to limit its damages to some extent.

Numerica, however, sustained an initial loss of $348,000 as a result of its discretion-

ary deposit of funds in Fontana's account. On June 1, 1989, the approximate date when Numerica's officials reported this conduct to the authorities, Fontana negotiated a promissory note with Numerica in the amount of $354,928.86. This acknowledged his indebtedness and converted his Numerica account into a loan secured by Medical Dental's assets. Numerica recovered part of the outstanding loss before it seized the Medical Dental assets and sold them in further satisfaction of the debt.

On the morning of August 28, 1990, the Federal Bureau of Investigation culminated its investigation into the scheme by sending Special Agent Kenneth J. Jackson to arrest Fontana at the offices of Vail Internal Medicine in Vail, Colorado, where Fontana was employed. Jackson testified at trial that he placed Fontana under arrest and told him that the two then would travel to Denver to appear before a magistrate. Jackson accompanied Fontana to his private office where he frisked him. At that time, Fontana requested use of the telephone to speak to his lawyer. He telephoned his wife and instructed her to contact his lawyer. After this call, Jackson took Fontana to the Vail police station. There Jackson notified other agents by telephone of the arrest. Jackson testified that he recalled no other telephone calls having been made by Fontana.

After leaving the Vail police station, at Fontana's request Jackson drove Fontana to his residence so he could "drop off his car keys" with his wife. That trip took approximately five to ten minutes, during which Fontana asked questions about the arrest and the day's possible events. Jackson testified that Fontana asked more specific questions about the indictment against him in New Hampshire and other facts relating to the case. Jackson testified that "When he started asking me those questions, I told him that if he wanted to discuss the case, I would have to advise him of his rights and he would have to waive those rights." After the execution of a Waiver of Rights form by Fontana, Jackson discussed with him in limited detail the nature of the case.

At Fontana's residence, Fontana's wife talked to him while he remained seated in Jackson's vehicle. Jackson testified that Fontana's wife told Fontana of her inability to locate their attorney. Fontana responded by instructing her to call a different attorney. After this conversation, Jackson drove Fontana the 100 miles to Denver. No further Waiver of Rights forms were executed during the trip. During the drive of approximately two hours, the two engaged in what Jackson referred to as both a conversation and an interrogation. Fontana made certain incriminating statements, including an admission to "swinging the checks from account to account". At the suppression hearing on the day before trial, Fontana moved to suppress these statements. The motion was denied following the hearing.

Fontana was convicted by a jury in the District of New Hampshire of knowingly conducting a check kiting operation in violation of both § 1344 and § 2314. He was sentenced to twelve months imprisonment, to be followed by three years of supervised release. He was ordered to perform 1500 hours of community service and to pay restitution of $276,128.86. He has been released on bail pending this appeal which followed.

## II.

We turn first to Fontana's claim that the government failed to satisfy its burden of proof under § 1344 as that burden was defined by the court's charge to the jury.

■ Fontana contends that the language of the charge required the government to prove some misrepresentation before he could be convicted. We agree with Fontana that the charge, to which the government did not object, became the law of the case, absent plain error. *United States v. Anguilo*, 897 F.2d 1169, 1196 (1 Cir.1990), *cert. denied*, 111 S.Ct. 130 (1990). But we do not agree with Fontana's claim that the charge required an additional showing of misrepresentation.

■ The bank fraud statute, § 1344, prohibits two types of conduct:

"Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; *or*

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, *by means of false or fraudulent pretenses, representations, or promises;*

[shall be punished]."

18 U.S.C. § 1344 (emphasis added). The indictment tracks the statute, but deviates in that it charges violations of (1) and (2) in the conjunctive rather than the disjunctive ("and" rather than "or"). Neither party contests whether the indictment sufficiently apprised appellant of the charges against him. *See, e.g., United States v. Waldeck,* 909 F.2d 555 (1 Cir.1990) (indictment will withstand appellate review where it has sufficient clarity to inform the defendant of the accusation against him). We find that the indictment adequately apprised Fontana of the government's intention to charge him under *either* prong of the bank fraud statute.

■ In challenging the jury charge, appellant claims that it imposed a burden upon the government, not found in the statute, to prove fraudulent misrepresentations under *both* prongs of § 1344. In its charge, the district court first read the indictment, which, as noted above, charged in the conjunctive a scheme to defraud and the obtaining of money by false pretenses. However, the court went on in its charge to read to the jury the *precise* language of the bank fraud statute, as we have set out above, which described the offenses of a scheme to defraud and the obtaining of money by false pretenses in the *disjunctive* ("or" rather than "and"). In reading that precise language, the court made a distinction between a "scheme to defraud" on the one hand, and the use of "false pretenses" on the other.

The district judge then went on to elaborate on the statutory language which he had just read, thereby requiring the government to prove that Fontana

"knowingly executed or attempted to execute a scheme or artifice to defraud and to obtain the use of moneys, funds and credits from the Numerica and State Street Banks.

Second, that the defendant did so by means of false or fraudulent pretenses, representations or promises.

Third, that the defendant knew at the time that the pretenses, representations or promises would be false when made.

[And] Fourth, that the defendant did so with the intent to defraud the banks...."

The district court again summarized the language of the bank fraud statute, but this time highlighted the *disjunctive* properties of the statute: "It is not necessary for the prosecution to prove that the defendant was actually successful in obtaining money or property by means of false ... pretenses, nor is it necessary for the government to prove that anyone lost money as a result of the alleged scheme or plan...."

Fontana contends that this charge creates for the government the burden of proving fraudulent misrepresentations under *both* prongs of § 1344. We disagree with appellant's characterization of the lower court's charge. We find the instant case distinguishable from those cited by appellant. *See, e.g., United States v. Cronic,* 900 F.2d 1511 (10 Cir.1990) (where jury charge relating exclusively to the second prong, obtaining money by false pretenses, met with no objection, the government saddled itself with the burden of additional proof). This case contained an indictment alleging violation of both prongs of the bank fraud statute, coupled with a charge which similarly touched on both distinct prongs of the statute.

■ In reviewing the adequacy of a particular jury instruction, a single instruction cannot be evaluated in artificial isolation; rather, it must be evaluated in the context of the charge administered as a whole. *United States v. Goldblatt,* 813 F.2d 619, 623 (3 Cir.1987); *see also United States v. Johnson,* 462 F.2d 423, 429 (3 Cir.1972), *cert. denied,* 410 U.S. 937 (1973) ("Specific

sections of the charge taken out of context are often used to form the basis for arguments alleging prejudicial error. We have looked at the whole cloth of the trial, including the entire charge....").

In reviewing the charge administered by the district court in the instant case, we give great weight to the fact that the language of the statute was read precisely and in full. The charge clearly showed the existence of two disjunctive prongs of § 1344, only one of which by its plain language requires the showing of fraudulent misrepresentations. Accordingly, we find that the lower court's charge was adequate and did not impose any additional burden of proof on the government.

■ Finally, Fontana's check kiting plan constituted a scheme or artifice to defraud, in violation of the first prong of the statute, § 1344(1). *United States v. Bonnett,* 877 F.2d 1450 (10 Cir.1989); *United States v. Rafsky,* 803 F.2d 105 (3 Cir.1986), *cert. denied,* 480 U.S. 931 (1987).

In short, we affirm the conviction for bank fraud under § 1344(1).

## III.

We turn next to Fontana's claim that as a matter of law he was improperly convicted under 18 U.S.C. § 2314 of interstate transportation of falsely made securities. While we agree with Fontana that a check drawn on insufficient funds is not "fraudulently made" within the meaning of § 2314, we nevertheless affirm his conviction based on his unauthorized signature as maker of checks drawn on the Medical Dental account, which were negotiated in accordance with his scheme to defraud the banks.

In Counts Two through Twenty-four, the indictment charged Fontana with violating § 2314. Only the convictions under Counts Two and Thirteen are being affirmed, those under Counts Three through Twelve and Fourteen through Twenty-four having been vacated. *See supra,* page 798. The statute provides that "[w]hoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited se-

curities ... knowing the same to have been falsely made, forged, altered, or counterfeited ... [shall be punished]." For the purposes of § 2314, "securities" are defined as including checks. 18 U.S.C. § 2311 (1988).

The appropriate interpretation of the term "falsely made" has been the subject of widespread debate among the circuits. Historically, that inquiry focused on forgery within the meaning of § 2314, which essentially resulted in the construction of "forged" and "falsely made" as substantially the same.

> "As used in criminal statutes, the words 'falsely made' and 'forged' are homogeneous, partaking of each other. They have always been synonymously construed to describe a spurious or fictitious making as distinguished from a false or fraudulent statement. The words relate to genuineness of execution and not falsity of content."

*United States v. Sparrow,* 614 F.2d 229, 233–34 (10 Cir.1980), *cert. denied,* 450 U.S. 1004 (1981). *See also United States v. Crim,* 527 F.2d 289 (10 Cir.1975), *cert. denied,* 425 U.S. 905 (1976).

■ In part, this concern over proper or genuine identity is borne out in the close attention courts have given to cases of forgery. They consistently have defined those activities which involved misrepresentation of identity as within the scope of § 2314. For example, the use of a fictitious name as drawer of a check on a company account has given rise to a "forgery" under the statute when coupled with fraudulent intent. *United States v. Seay,* 386 F.Supp. 550 (E.D.Ill.1974), *aff'd,* 518 F.2d 646 (7 Cir.1975) (per curiam), *cert. denied,* 423 U.S. 995 (1975). *See also United States v. Huntley,* 535 F.2d 1400 (5 Cir.1976) (en banc), *cert. denied,* 430 U.S. 929 (1977) (use of name other than that of actual person involved in transaction is ground for conviction); *United States v. Metcalf,* 388 F.2d 440 (4 Cir.1968) (check on individual account opened in fictitious name). *Cf. United States v. Tyson,* 690 F.2d 9 (1 Cir.1982) (an otherwise valid security, but with a forged endorsement is

not a "falsely made security"). The Seventh Circuit has held that knowledge that a check has been "forged" constitutes a violation of § 2314. *United States v. Solomon*, 422 F.2d 1110 (7 Cir.1970), *cert. denied*, 399 U.S. 911 (1970). One who signs the name of another real person authorized to sign has committed a "forgery" within the meaning of § 2314. *Parker v. United States*, 297 F.2d 135 (5 Cir.1961).

The cases in the previous paragraph are distinguishable from the instant case in that each involves a defendant who sought to sign the name of another, whether a real or fictitious person, on the face of securities destined for interstate travel. Each goes to the heart of the intent of Congress to prohibit interstate transportation of securities that are not genuine. Fontana correctly points out that he did not sign the name of another real or fictitious person; rather, he signed his own name as maker of each check. He asserts that this rendered each check "genuine" in view of the absence of forgery or alteration and therefore beyond the scope of § 2314. We disagree.

■ Our decision that his actions resulted in fraudulently made securities cannot rest upon the fact that the checks were drawn on insufficient funds. Under *Williams v. United States*, 458 U.S. 279 (1981), and its progeny, checks in and of themselves are not representations that sufficient funds are in a particular account to pay the face amounts of the checks. Rather, checks are essentially orders to pay issued to the bank by the owner of the account, who also is the maker of the check. Since a check is not a factual assertion, it can be construed as neither true nor false for the purposes of § 2314. *Id.* at 284 In short, conviction under § 2314 must rest on "genuineness of execution and not falsity of content." *Marteney v. United States*, 216 F.2d 760, 763 (10 Cir. 1954).

If a check is construed as an order to the bank, then it follows that the crux of any banking system must be the identification of those persons who are authorized to order that payment, i.e. those authorized to make withdrawals from a particular account.

> "[Because] the nature of a draft is a request for payment from another's account, such a request should be based upon a real or believed obligation of the obligor to pay to the maker of the draft. The making of the draft with the knowledge that there is no obligation and/or no actual person or entity by whom it is owed would tend to falsify the nature of the instrument in the same sense that a check is falsified when a check is drawn in another person's name either real or fictitious."

*United States v. Hagerty*, 561 F.2d 1197, 1199 (5 Cir.1977).

■ In accordance with this interpretation of § 2314, the Supreme Court in *Moskal v. United States*, 111 S.Ct. 461 (1990), rejected attempts to construe "falsely made" as an exclusive incorporation of the concepts of "forged" or "counterfeited". In *Moskal*, the defendant participated in a "title washing" scheme. His confederates purchased used cars, rolled back the odometers, and altered the titles to reflect the lower mileages. The altered titles then were sent to an accomplice in Virginia. He submitted them to unwitting Virginia officials who issued Virginia titles incorporating the false mileage figures. In that case, the Court held that construing "forged" as the equivalent of "counterfeited" would "fail to give effect ... to every clause and word of a statute." *Id.* at 466 (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). Rather, the term "falsely made" must be interpreted as an expansion of the concept of "forged" or "counterfeited":

> "We think it apparent that the purpose of the term 'falsely made' was to broaden the statute beyond rigorous concepts of forgery and to prohibit the fraudulent introduction into commerce of falsely made documents regardless of the precise method by which the introducer or his confederates effected their lack of authenticity."

*United States v. Davis*, 888 F.2d 283, 285 (3 Cir.1989) (quoting *United States v.*

*Huntley,* 535 F.2d 1400, 1402 (5 Cir.1976), *cert. denied,* 430 U.S. 929 (1977)). The *Moskal* Court held that, since Moskal received admittedly genuine titles, issued by proper public officials, knowing them to have been falsely made, his conviction under § 2314 was affirmed.

Other courts that have been presented with the issue of a defendant who affixes his *own* name to a security which travels to interstate commerce have followed *Moskal*'s reasoning. In *United States v. Crim,* 527 F.2d 289 (10 Cir.1975), the court held that the simultaneous use of the defendant's formerly established alias, in conjunction with the use of his new name, gave rise to a falsely made security; this is so because a person cannot have two "real" names at one time. As a result, the use of one of those names on a security which moved in interstate commerce justified a conviction under § 2314. Likewise, in *United States v. Frick,* 492 F.2d 791 (5 Cir.1974), the court dismissed a challenge to the conviction of a defendant who continued to use his former alias on securities which moved in interstate commerce. The court stated:

> "Finally, appellant urges that he cannot be guilty of false making or forgery because he signed the checks with an alias which he believed he had the *authority* to use and on an account which he believed to be active. The short answer is, first, that the fact that he may have used the alias in and around New Orleans does not establish (nor is there other evidence establishing) that it was *authorized* as a name (and signature) to be honored on his Chicago bank account...."

*Id.* at 792–93 (emphasis added). *Cf. Greathouse v. United States,* 170 F.2d 512 (4 Cir.1948) (holding that a security bearing a defendant's own genuine signature is not a *forgery* and therefore does not come within § 2314 which is read to equate "falsely made" with "forged").

The focus of our inquiry is whether Fontana, as maker of the checks, had any *authority* with respect to the accounts which yielded the kited checks in question. *E.g., United States v. Phillips,* 869 F.2d 1361, 1364 (10 Cir.1988) (approving charge that allowed jury to find that a check is falsely made if "the maker of the check is not authorized to sign on the account from which the check is drawn."). "[I]t has been uniformly held that a check drawn by a *true maker* on an existing bank is not 'falsely made' or 'forged' within the meaning of the statute, even though there were no funds to the account of the drawer in the drawee bank." *Marteney v. United States,* 216 F.2d 760, 763 (10 Cir.1954) (emphasis added). Use of the term "true maker" can only encompass someone who is *authorized* to be a maker for the purpose of checks drawn on a particular account.

Following those circuits which subscribe to the rule that documents validly issued, but containing material false information are "falsely made", *e.g., United States v. Davis,* 888 F.2d 283, 285 (3 Cir.1989), we hold that the checks signed by Fontana as maker did not even reach the plateau of being "validly issued". Our inquiry reinforces the consistently held view that "[t]he mere fact that a draft, money order, or certificate of title ... is genuine, does not, in and of itself, preclude a § 2314 conviction." *United States v. Sparrow, supra,* 614 F.2d at 234. *See also United States v. Hagerty,* 561 F.2d 1197, 1199 (5 Cir.1977) ("Although [the defendant] signed his own true name, he falsely made the security by filling in the drawee information without authorization.... These actions are obviously within the meaning of 'falsely made'...."); *United States v. Huntley, supra,* 535 F.2d at 1403 (The absence of a real person by the name of that signed by the defendants on the securities "eliminates the need to prove lack of authorization as a separate element of the offense."); *United States v. Williams,* 498 F.2d 547, 551 (10 Cir.1974).

In reviewing Fontana's conviction, it is elemental that the evidence must be viewed in the light most favorable to the government. *United States v. Valencia–Lucena,* 925 F.2d 506, 512 (1 Cir.1991). In the instant case, the government adduced testimony that Fontana was not a signatory for either of the two accounts maintained at

State Street and Numerica, respectively. Accordingly, we cannot hold that he was a "true maker", since such a holding would effectively shield him from liability under § 2314 by removing the element of "fraudulently made" securities. Furthermore, Fontana adduced no evidence to show that he was authorized by either Terri Fontana, his wife and sole signatory for the Numerica account or N. John Fontana III, his son and sole signatory for the State Street account, to be the maker of checks drawn on that account. While we recognize that Fontana for some time was the President of Medical Dental, he did not adduce any evidence to explain the maintenance of signature cards for the two accounts in the names of Terri Fontana and N. John Fontana III, respectively, and not in the name of the President. Furthermore, we recognize that some testimony by the office manager, Lorraine Plante, indicated that Fontana frequently signed payroll checks. Without more, however, we cannot conclude as a matter of law that he was thereby authorized to draw checks in large sums exceeding $5,000 which were involved in this check kiting scheme.

 Moreover, Fontana's actions tended to establish the presence of fraudulent intent and a scheme to defraud the banks. Despite the so-called "innocence" of his actions, we hold that such intent was enough to justify his conviction under § 2314. A person who transports a falsely made security in interstate commerce violates § 2314, if he does so with unlawful or fraudulent intent *and* if the false information itself is material. *Moskal, supra,* 111 S.Ct at 470. In the instant case, Fontana had the requisite fraudulent intent in that he knew that he was not an authorized signatory on the accounts and yet he drew checks as if he were authorized. Moreover, he drew those checks with the knowledge that he was conducting a check kiting scheme which would result in his acquiring funds which did not belong to him before the check had gone through the full check processing cycle.

We affirm the conviction under § 2314.

IV.

This brings us to Fontana's claim that the district court erred in denying his motion to suppress the incriminating statements made to Agent Jackson during the drive from Vail to Denver immediately following his arrest.

 Under *Miranda v. Arizona,* 384 U.S. 436 (1966), an accused has a right pursuant to the Fifth and Fourteenth Amendments to have counsel present during custodial interrogation. An accused may make a valid, knowing and intelligent waiver of that right by choosing to respond to interrogation. If the accused exercises his right to counsel, however, additional safeguards are necessary to protect the accused:

> "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. [A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*"

*Edwards v. Arizona,* 451 U.S. 477, 484–85 (1980) (footnote omitted) (emphasis added). Initiation of interrogation by the accused has been broadly interpreted. In *Oregon v. Bradshaw,* 462 U.S. 1039 (1982), the accused exercised his right to have counsel present during custodial interrogation. Sometime later, while the accused was being transferred to another holding facility, he asked the police officer accompanying him, "Well, what is going to happen to me now?" The officer responded by saying, "You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since you have requested an attorney, you know, it has to be at your own free will." *Id.* at 1042. In holding that this conversation

constituted an initiation within the meaning of *Edwards*, the Court wrote:

> "While we doubt that it would be desirable to build a superstructure of legal refinements around the word 'initiate' in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot fairly be said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*."

*Id.* at 1045.

We can hardly conceive of a factual scenario more similar to that of the present case. Upon his arrest, Fontana requested an opportunity to contact his attorney. Agent Jackson readily afforded him that opportunity. During the drive from the Vail Police Station to Fontana's home, Fontana asked a question about the day's coming events: "What's going to happen to me?" Under those circumstances, we could easily hold that Fontana's inquiry, while ambiguous, evinced a willingness and a desire for a generalized discussion about the investigation. This was not an inquiry arising out of the incidents of custodial relationship, such as an inquiry about the location of a restroom or telephone.

The facts of the instant case render our task clear. Agent Jackson testified: "When he started asking me [questions about what this was in regards to in New Hampshire and specific facts about the case] I told him that if he wanted to discuss the case, I would have to advise him of his rights and he would have to waive those rights." Jackson did not immediately seize upon Fontana's inquiry as a waiver of his rights under *Edwards*. Rather, he clearly advised Fontana of the ramifications of his questions and then secured a *written waiver* from Fontana of his *Miranda* rights. It was only then that Jackson discussed the case with Fontana.

Fontana asserts that, upon meeting his wife at his residence, he reasserted his right to counsel, which required Jackson again to await initiation of the conversation before continuing any discussion regarding the case. It was after this alleged reassertion of his rights that Fontana made the incriminating statements regarding his "swinging the checks". There is no evidence to suggest that Fontana's conversation with his wife was meant to reassert his right to counsel. Rather, Fontana merely discussed with his wife his instructions for her to contact another lawyer upon learning that his usual counsel was away on vacation. Fontana did not suffer from the type of coercion that *Edwards* and its progeny are designed to redress.

We affirm the denial of Fontana's motion to suppress the statements.

### V.

To summarize:

First, the plain language of § 1344(1) requires that the government prove a scheme or artifice to defraud; there is no requirement that the government prove fraudulent misrepresentation. The charge, taken as a whole, does not impose an additional burden upon the government. The conviction on Count One is affirmed.

Second, in light of the recent breadth given to the definition of "falsely made", Fontana's signing his own name to securities, where he was unauthorized to do so and where he had full knowledge that he was obtaining funds that did not belong to him, resulted in "falsely made" securities. We affirm his convictions on Counts Two and Thirteen under § 2314; but we vacate his convictions on Counts Three through Twelve and Fourteen through Twenty-four under § 2314.

Third, we affirm the denial of Fontana's motion to suppress his incriminating state-

ments, since they were made only after his knowing and intelligent waiver.

Affirmed.

CYR, Circuit Judge (concurring).

I write separately on the jury instruction challenge relating to Count One. Fontana concedes that the government proved, beyond a reasonable doubt, that he violated subsection 1344(1) by engaging in a scheme or artifice to defraud. He contends nevertheless that the jury instruction on Count One became the law of the case and had the effect of saddling the government with the gratuitous burden of proving that Fontana defrauded the banks by means of "false or fraudulent pretenses, representations, or promises," as would be required to establish the separate offense criminalized under subsection 1344(2).

Under the holding in *Williams v. United States*, 458 U.S. at 284–85, 102 S.Ct. at 3091–92, mere presentation or deposit of a check does not constitute a "representation" to the honoring bank that there are sufficient funds in the checking account. Fontana therefore argues that his conviction under Count One must be set aside since the government produced no evidence of a false representation, pretense, or promise. In light of the discussion in Part III of the majority opinion, however, the court need not have reached Fontana's "law of the case" claim.[1]

Part III of the majority opinion discusses Fontana's conviction, under Counts Two and Thirteen, for interstate transportation of "falsely made" securities. *See* 18 U.S.C. § 2314. The court correctly concludes that the *Williams* holding is inapposite to the section 2314 charge and that Fontana's conviction under section 2314 can be predicated on Fontana's proven *conduct* in signing a series of checks with the knowledge that he was not an authorized signatory.

The very same evidence supports Fontana's conviction under Count One, even assuming Fontana's "law of the case claim" is well founded. The knowing execution of checks by an unauthorized signatory unquestionably constitutes a series of "false or fraudulent pretenses [or] representations" within the meaning of subsection 1344(2). *See United States v. Bonnett*, 877 F.2d 1450, 1456–57 (10th Cir.1989) (collateral conduct, independent of actual contents of checks, designed to give false impression and lull banks into false sense of security may constitute false pretenses, representations or promises).[2] There was ample evidence that Fontana engaged in a pattern of *conduct* designed to defraud the banks by holding himself out as a true maker of the corporate checks. The government presented direct evidence that Fontana was not an authorized signatory on these corporate checks. It presented circumstantial evidence that Fontana knew

1. Furthermore, the majority's treatment of the claim is met with considerable difficulty. The "law of the case" issue is whether the jury instruction had the effect of making the "false or fraudulent pretenses, representations or promises" requirement in subsection 1344(2) an element of the crime charged in Count One. The majority opinion notes that the district court read section 1344 to the jury *verbatim*, including the disjunctive "or" separating subsections (1) and (2). Since its discussion as to whether the reading of the statute disposed of Fontana's claim is inconclusive, the majority proceeds, with decidedly less success, to identify other indications that the jury instruction interpreted section 1344 in the disjunctive. I am particularly concerned by the majority's reliance on jury instruction language to the effect that the government was required to prove the completion or success of *neither* a false representation *nor* a scheme to defraud. The relevant passage in the jury instruction continued, however, and concluded with the following language: "as

such scheme or plan, even if it is not successful, is as illegal as it would be if it were successful." Viewed in context, it is crystal clear that the disjunctive negatives used by the court were merely to disabuse the jury of any notion that Fontana could not be convicted under Count One unless the government proved that the conduct he engaged in was *successfully* completed. This is standard language in jury instructions relating to a fraudulent scheme. *See, e.g., United States v. Kelley*, 929 F.2d 582, 585 (10th Cir.1991); *United States v. Solomonson*, 908 F.2d 358, 363–64 (8th Cir.1990). Thus, the language alluded to in the majority opinion says nothing about whether the government had to prove *both* a scheme to defraud *and* a false pretense, representation or promise.

2. It is well recognized that "false pretenses" may be shown by either written or oral statements, or by *conduct*, designed to deceive. *See, e.g., Black's Law Dictionary* 541–42 (5th Ed.1979).

he was not an authorized signatory at the time he executed the checks. Thus, there was sufficient evidence to establish, beyond a reasonable doubt, that Fontana executed the fraudulent scheme by means of false pretenses or representations. I would affirm Fontana's convictions under Counts One, Two, and Thirteen on the same ground.