**UNITED STATES of America, Plaintiff,**

v.

**Lloyd WILLIAMS, Defendant.**

**Criminal No. 96–226(SEC).**

United States District Court,
D. Puerto Rico.

Jan. 9, 1997.

---

30. Docket no. 25.

31. Docket no. 6.

**68**

Jorge E. Vega–Pacheco, Assistant U.S. Attorney's Office, Criminal Division, Hato Rey, PR, for Plaintiff.

Anita Hill–Adames, Assistant Federal Public Defender's Office, Hato Rey, PR, for Defendant.

## OPINION AND ORDER

CASELLAS, District Judge.

This case is before the Court on defendant Lloyd William's motion to suppress (Docket # 19), which was duly opposed (Docket # 25). Defendant essentially contends that a statement which he rendered in the absence of counsel during a custodial interrogation should be suppressed on the ground that he did not knowingly and intelligently waive his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court held a hearing on the motion to suppress on December 12th and 13th, 1996. Upon careful consideration of the witnesses' testimony, the parties' arguments and the applicable law, defendants motion to suppress is hereby **GRANTED**.

### Factual Background

Early in the afternoon of July 28, 1996, while working his regular shift as passenger luggage carrier at the M/V Seaward, defendant Lloyd Williams was ordered to go up to his cabin. When he arrived, he encountered his three cabin mates and various customs agents, who proceeded to search among his personal belongings. Asked about some sandals that were lying on the cabin's floor, Williams allegedly told the agents that they did not belong to him. Nevertheless, the agents ordered him to put them on top of his bed, which he did. The sandals tested positive for heroin. The agents then interrogated Williams and his three cabin mates about the ownership of the sandals. All four denied ever having seen those sandals before. Soon thereafter, the agents escorted Williams and the cabin mates to the pier, located in the Old San Juan Ports Authority zone, and let the latter go free. Williams was handcuffed and told he was under arrest.

At around 4:15 p.m., Williams was brought to a small room without access to a bathroom, a telephone or food, and remained there alone for about three hours without further instructions. Finally, at around 7:20 p.m., customs agents Kenneth Hysell and Rosita Pérez came into the room to question defendant. Hysell allegedly asked Williams whether he wanted to cooperate with the government and waive his rights. Upon receiving an affirmative answer, Hysell proceeded to read Williams his *Miranda* rights line by line, stopping at the end of each line to ask defendant whether he understood, to which Williams responded with a "yes". Once finished, Hysell and Pérez questioned defendant, who allegedly admitted having committed the offense of which he was accused. The interview finally ended at 8:15

p.m., once defendant signed his waiver of rights. Defendant was subsequently taken to the Old San Juan customs office at La Puntilla, and was later delivered to the Metropolitan Detention Center in Guaynabo, Puerto Rico at around 12:00 a.m. He was eventually charged with possession of 1,246 grams of heroin with intent to distribute, and with the importation of the same, in violation of 21 U.S.C. § 841(a)(1) and 952(a).

## A. *Defendant's psychological background*

Williams is a twenty-four year old native of the Caribbean island of St. Vincent. His family ties are rather weak, since his mother died when he was young, and he never knew his father. He was raised by an aunt in St. Vincent, where he grew up. Williams allegedly attended Evesham Elementary School until the fifth grade, when he went to the mountains to work as a farm-hand, picking bananas. Upon turning twenty-three, however, Williams decided to go abroad for the first time, in search of a better job. In January, 1995, he was hired by the SS Norway until December of that year. On February 25, 1996, he began to work for the M/V Seaward in the utilities/galley area. Besides working in the galley, he cleaned cabins, set up tables and carried passenger luggage. Prior to his arrest, he had no previous criminal record.

Given that defendant's central contention in his motion to suppress is that he was unable to knowingly and meaningfully understand his waiver of rights, counsel for both plaintiff and defendant ordered that a psychological evaluation be conducted prior to the hearing. Dr. Francisco Umpierre—who subsequently testified for the government in the suppression hearing—administered several tests to determine defendant's capacity to stand trial, as a result of which concluded that defendant's level of intellectual functioning—in the "low normal" range, with an IQ of 80—rendered him competent. Transcript of Proceedings for Thursday, December 13, 1996 ("Transcript # 1"). When asked whether defendant could have also understood his

Miranda Warnings, Dr. Umpierre maintained that he would have probably been able to do so if they were properly explained to him. Transcript # 1, at 53, 81. Nevertheless, Dr. Umpierre acknowledged that William's capacity to plan his legal strategy with his counsel was very slim, since he had a limited understanding of the role of defense counsel, prosecutor, judge, jury and witnesses, as well as the basic procedures of a criminal trial. Government's Exhibit 3, at 7, 8. As an example, Dr. Umpierre mentioned that Williams thought he had a good chance of winning the case because he had never dealt with drugs. Government's Exhibit 3, at 7. Dr. Umpierre thus suggested that "Williams be thoroughly briefed about courtroom procedures and general rules so he [could] make better informed decisions." Government's Exhibit 3, at 8.

Dr. Gladys Altieri—who later testified for defendant in the suppression hearing—performed various tests to specifically evaluate Williams' comprehension of his waiver of rights. As a result of such tests, she concluded that he had an intellectual functioning of mild mental retardation, with an average IQ of 69, which explained his limited verbal skills, his limited ability to understand what was being read and his poor expressive language. Defendant's Exhibit B, at 5. Dr. Altieri mentioned that when asked what he understood by the statement "you have the right to remain silent", he answered "yes, it means I cannot move." Defendant's Exhibit B, at 10–11. She asserted that this type of very literal reasoning was common in children younger than twelve, and that his mentality was probably that of an eight year old. Transcript # 1, at 103. She also determined that his affirmative reaction was very common in mildly mentally retarded individuals, who go to great lengths to try to please people, especially people with authority. Defendant's Exhibit B, at 9–11. See also Transcript # 1, at 111.[1] Although Dr. Altieri held that Williams could, in fact, be trained to do things, she concluded that this fact was not incompatible with mild mental retardation. Defendant's Exhibit B, at 8.

---

**1.** This response has been labeled "cheating to lose." Transcript # 1, at 111, 114. Dr. Altieri maintained that "mildly mentally retarded peo-

ple tend to please authority figures and they are very vulnerable to suggestions."

Based on the forgoing, Dr. Altieri concluded that Williams could not have been able to understand his *Miranda* rights, since the concepts contained in these rights are extremely abstract, and people do not usually acquire such a sophisticated level of abstraction until they reach the seventh grade. Defendant's Exhibit B, at 10. See also Transcript, at 107. Upon being interrogated as to the discrepancy between her results and those rendered by Dr. Umpierre, Dr. Altieri explained that they had used somewhat different sources to interpret the tests performed upon defendant, and that some of the techniques used by Dr. Umpierre during his evaluation were currently mostly used to evaluate children. Transcript # 1, at 121. She also referred to the fact that a learning process could have occurred in the short time lapse between the two interviews as a possible reason for such inconsistencies. Dr. Altieri explained that "in the field of psychological and psychometric testing there is a phenomenon that occurs when a person is tested with the same tests very close together. A learning process might occur because they were presented the same stimulus in a very close time." Transcript # 1, at 175. Both Dr. Umpierre and Dr. Altieri admitted to some minor inaccuracies in their reports. See, e.g., Transcript # 1, at 64, 201.

### B. Defendant's Job Recommendations

To impeach Dr. Altieri's testimony, plaintiff submitted recommendations from two of Williams' teachers at Evesham Elementary, who asserted that they were his sixth grade teachers and that he had been a good student. Defendant countered this argument through Dr. Umpierre's testimony, who admitted that letters of recommendation do not necessarily reflect a person's abilities since they are often written to help a person; in this case, to get a job on the cruise ship. Transcript # 1, at 61, 62.

### Applicable Law

 It is now a well established principle that statements produced as a result of a custodial interrogation are admissible only if the government establishes that it has complied with the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A suspect may choose to waive these rights, but such a waiver will only be considered valid if it is carried out in an intelligent and knowing manner. *United States v. Garcia*, 983 F.2d 1160 (1st Cir. 1993); *United States v. Fontana II*, 948 F.2d 796 (1st Cir.1991). The requirement that the waiver be "knowing and intelligent" has been held to imply "a rational choice based upon some appreciation of the consequences of the decision." *Cooper v. Griffin*, 455 F.2d 1142, 1145 (5th Cir.1972).

 The government has a heavy burden "to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to appointed counsel." *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), *cited in Cooper v. Griffin*, 455 F.2d 1142, 1144 (5th Cir.1972). This burden is not met simply by reading a defendant his rights. "*Miranda* requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them." *United States v. Christian*, 571 F.2d 64, 68 (1st Cir.1978).[2]

In assessing the effect of a constitutional waiver, the Supreme Court has always required adherence to a "totality of the circumstances" test. *Henry v. Dees*, 658 F.2d 406, 409 (5th Cir.1981), referring to *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). *See also United States v. Garcia*, 983 F.2d at 1169; *United States v. Ferrer–Cruz*, 899 F.2d 135, 141 (1st Cir.1990). Mental deficiency, age and lack of familiarity with the criminal process have been held to be important factors to consider in determining whether a defendant validly waived his constitutional rights. *Cooper*, 455 F.2d at 1145. In fact, the Supreme Court has repeatedly asserted that a "limited mental ability and unfamiliarity with the criminal process are factors which weigh heavily

---

**2.** The Supreme Court has nevertheless stated that "a waiver of the auxiliary protections established in Miranda should require no higher standard of proof [than the voluntariness of a confession, which is established only by a preponderance of the evidence]." *Colorado v. Connelly,* 479 U.S. 157, 167–70, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986).

against the voluntariness of a confession." *Id.,* referring to *Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). See also *Jurek v. Estelle,* 623 F.2d 929, 937 (5th Cir.1980). In *Sims v. Georgia,* 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967), for example, the Supreme Court held that, given that defendant had only a third grade education; a "decidedly limited" mental capacity; that he had not been given access to family, friends or counsel and that he'd been kept in custody for eight hours without food, defendant could not have validly waived his constitutional rights. 389 U.S. at 405–07, 88 S.Ct. at 525. Similarly, in *Henry v. Dees,* the Fifth Circuit concluded that

> [w]hen persons of markedly limited mental ability ... are questioned without the aid of counsel, issues 'of suggestibility and possible overreaching are raised ... and must be factored into a consideration of the totality of the circumstances.' *Jurek v. Estelle,* 623 F.2d at 938. Extra precautions must be taken. It must be painstakingly determined that they comprehend what events are transpiring. In addition, the presence of counsel should be assured absent an unmistakable, knowing waiver of that assistance.

*Id.* at 411. Furthermore, it should be noted that illiteracy has also been regarded as an additional factor to be considered in determining the voluntariness of a confession. *Northern Mariana Islands v. Mendiola,* 976 F.2d 475 (9th Cir.1992).

### Analysis/Application of Law to Facts

■ The government sustains that defendant Lloyd Williams knowingly and intelligently waived his constitutionally guaranteed *Miranda* rights. According to plaintiff, agent Hysell went over each and every one of defendant's *Miranda* rights slowly and carefully, stopping at the end of each line to ask him whether he understood. Having done that, Hysell and agent Rosita Pérez proceeded to interrogate Williams for about half an hour to forty-five minutes, and once they finished, they asked him to sign the waiver form which had previously been read to him. Transcript of Proceedings for Friday, December 13, 1996 ("Transcript # 2"), at 33–34. The government contends that there was absolutely no coercion involved; and that the agents are law abiding citizens who did not and could not have concocted a story to suggest to Williams what he should answer. Transcript # 2, at 66.

To determine whether the forgoing confession was indeed voluntary, based on the "totality of the circumstances" test, one must take into account the fact that defendant was held alone and handcuffed in a Ports Authority office without food or drink for about three hours prior to his interrogation. Transcript # 2, at 13–14. Also important are some of the facts which came out in the suppression hearing, such as Williams' testimony that he thought he was going to go back to his ship once the questioning was over (Transcript # 2, at 22); Dr. Umpierre's testimony that Williams knew very little about courtroom procedures (Transcript # 1, at 52); and Dr. Altieri's testimony that Williams was unable to understand things unless they were slowly and clearly explained to him (Transcript # 1, at 109). More important still is Dr. Altieri's testimony that when she specifically asked Williams what he understood by "you have the right to remain silent", he said he thought it meant that he could not move. Transcript # 1, at 101. See also Transcript # 2, at 17, 48.

The Court must also weigh the fact that, during Williams' direct and cross examination, he failed to understand even simple, straightforward questions. For example, when asked what he understood by the concept of "right", he answered that he thought of right, as in right and wrong. Transcript # 2, at 20. Plaintiff had to constantly rephrase his questions in order to elicit any answers from defendant. For example, when asked whether he had a preference for the industrial arts, Williams said "industrial arts, what is that?" Transcript # 2, at 38. When asked whether he had good behavior as a student, he said "Huh?" Once plaintiff's counsel rephrased the question to "were you well behaved at school?," he answered "yes, I believe good." Transcript # 2, at 39. Furthermore, when plaintiff's counsel asked him whether he knew how to read, Williams answered "not very well." Transcript # 2, at 31. Asked what exactly could he read, de-

fendant said he could read his name. Transcript # 2, at 32. When told to be more specific, defendant pointed at the courtroom wall and read the phrase "In God We Trust." Transcript # 2, at 42. Finally, when he was questioned as to whether he understood what that meant, he said: "Yes. You do everything what's right." *Id.*

As evidenced by the forgoing, William's demeanor in the courtroom clearly established that his reading abilities are fairly limited and, what's more important, that his comprehension of abstract concepts such as "right", "God" and "trust"—concepts which are no less abstract than those present in Miranda warnings—is almost nil. Even if we were to establish that—given a possible margin of error of about five points between the tests which the experts administered upon defendant, and the possibility that a learning process may have occurred as a result of the administration of Dr. Altieri's test—defendant is a borderline case of mild mental retardation (see Transcript # 1, at 204), the experts' opinions, coupled with defendant's demeanor in court, makes the balance tip toward our concluding that Williams could not have understood the warnings which were administered to him.

The government argues that to require customs agents to go beyond an inquiry into whether the suspect understands his rights in order to determine whether the waiver was "knowing and intelligent" would pose an insurmountable burden upon law enforcement officers. Transcript # 2, at 74. We disagree. Agent Hysell would have easily been able to determine whether Williams was capable of understanding his rights just by asking one more question, beyond a mere "did you understand?" By asking him questions such as "what do you understand by what I just said?" or "explain to me what it means," Hysell would have immediately realized that Williams did not, in fact, understand any of the concepts which were being read to him. This additional step would not, as plaintiff argues, constitute an insurmountable law enforcement problem.

Based on the totality of the circumstances mentioned above, we are convinced that defendant Lloyd Williams could not have

knowingly and intelligently understood the consequences of his waiver. It is our understanding that plaintiff did not meet its burden of proof by proving otherwise by a preponderance of evidence. Defendant's motion to suppress **(Docket # 19)** is therefore, **GRANTED.**

**SO ORDERED.**